## Ex Parte PICKETT.

1. The Supreme Court will take original jurisdiction of an application, by a member of the House of Representatives, for a *mandamus* against the Speaker of said House, to compel him to certify to the Comptroller of Public Accounts the amount to which the petitioner is entitled, as a member of said House, for mileage or *per diem* compensation.

2. The General Assembly, by a joint resolution of both Houses during its regular session, having adjourned on the 20th of December, 1853, to meet again on the 9th of January, 1854, a member who went home and returned during the recess, is entitled to mileage, but not to *per diem* compensation during the recess.

APPLICATION for a *mandamus*, by Richard O. Pickett, who was at the time a member of the House of Representatives, from Lawrence, against William Garrett, the Speaker of said House, to compel him to certify to the Comptroller of Public Accounts the amount to which the petitioner was entitled, for mileage, or *per diem* compensation, or both, accruing to him during the recess of the General Assembly, between the 20th of December, 1853, and the 9th of January, 1854. The Speaker admitted the facts stated in the petition, and consented that the court should, without further notice or delay, decide upon and allow such writ or relief as the petitioner might be entitled to. The facts upon which the petitioner bases his application, are set forth in the opinion.

SAMUEL F. RICE, for the petitioner, submitted the case without argument on the merits, and argued only the question of jurisdiction. He furnished the subjoined brief of his argument:

1. The Speaker, in performing the duty imposed on him by § 45 of the Code, is both a ministerial and a judicial officer. The law itself determines that compensation shall be made to each member, and fixes the rule, in § 43 of the Code, by which the amount of that compensation shall be ascertained; and thus far, the Speaker must act as a ministerial officer. But the law does not determine how many days a member may have attended, nor whether he has been detained by sickness, nor how

many miles he may have travelled to and from the General Assembly; in these matters, not definitely fixed by the law itself, the Speaker acts judicially; for, if a member should claim too much travel, or too many days' attendance, the Speaker might rightfully refuse to certify for such excess, and might reject and disallow it.

The Speaker may then be regarded as an " inferior jurisdiction," within the meaning of the 2d section of the 5th article of our State constitution ; but in no other sense is he to be considered as such " inferior jurisdiction. His jurisdiction is " inferior" in this matter of compensation, to the Supreme Court, but not to the Circuit Court. And but for this provision of the constitution, his jurisdiction in that matter would not be inferior even to the Supreme Court, but would be final and conclusive, and not revisable. There is nothing in the Code—our statute law—which allows any mode of revision, or any appeal from his decision. It is the constitutional provision above cited, and that only, which enables even the Supreme Court to superintend and control his action. No other court can do it, because no statute law or constitutional provision confers upon any other court any such power; but the constitutional provision above cited, in effect, denies such power to any other court, by expressly conferring it on the Supreme Court. This court has original jurisdiction in such case, or, rather, it may, in the first instance, issue a *mandamus* in such case, and thereby control and superintend the inferior jurisdiction, which may be called appellate jurisdiction over such inferior jurisdiction.

The 23d section of the 3d article of the constitution declares, that " every bill, having passed both houses, shall be signed by the Speaker and President of their respective houses." Suppose a bill had passed both houses, and the Speaker had refused to sign it, and application were now made to this court, in the first instance, for a *mandamus* to compel him to sign the bill. Could this court hesitate to grant it ? or would it turn the matter over to a Circuit Court, which it knows will not meet until after the General Assembly will have adjourned *sine die*.

The constitution does not fix the time within which he must sign the bill. But the plain construction of it is, that he must sign during the session, and that upon his refusal, this court may compel him to sign before the adjournment. So the 45th

section does not fix the time when he shall certify for a member ; but the plain construction is, that, if during the session he refuses to certify, this court may, upon such refusal, instruct him as to the law, and superintend and control him, so far as to make him certify before the final adjournment.

The Circuit Court has no power, in any such case, to award a *mandamus* ; for it can only issue a *mandamus* to jurisdictions which are inferior to it, or to compel the performance of a merely ministerial act, where the law itself has fixed the precise amount of compensation, as in the case of Riggs v. Pfister, 21 Ala. R.

The Speaker does not reside at the seat of government, but in Coosa County. If the application for *mandamus* must be made to a Circuit Court, to which one of those courts must application be made ? Must every member of the House go home without his pay, and in the spring come back to Coosa Circuit Court to apply for a *mandamus* ? Is this the compensation promised to each member by the law ? or is this the vain remedy held forth by law, in derision of their injury ?

But no Circuit Court sits until next month. Suppose the Speaker dies, or resigns, or removes, before any Circuit Court meets. It is clear that no *mandamus* can be issued by a circuit judge in vacation.—*Ex parte* Grant, adm'r of McCord, 6 Ala. R. 91. Nor can a peremptory *mandamus* issue without service beforehand on the party against whom it is sought ; nor can it issue after the death, resignation or removal of the Speaker from the State.—Mason v. School Dist., 20 Vermont R. 488. Hence, if petitioner must wait until the Circuit Court meets, he waits until long after the final adjournment, and the Speaker may defeat the remedy by his own voluntary act, in resigning or removing from the State. This consideration was held sufficient to support the jurisdiction of this Court, in the first instance, in The State v. Porter, 1 Ala. 688 ; 5 W. & S. 403.

The remedy by *mandamus* lies from the Supreme Court, in the first instance, even if the Circuit Court could issue it, provided it appears, as in this case, that the remedy from the Circuit Court would not be adequate.—Ethridge v. Hall, 7 Porter 47 ; Com. v. Mann, 5 Watts & Serg. 403.

But the Supreme Court may well declare the law on the merits, even if it denies the *mandamus.—Ex parte* Hoyt, 13 Peters 290 ; *Ex parte* Jones, 7 Ala. 15.

CHILTON, C. J.—This is an application by Richard O. Pickett, a member of the House of Representatives, for a writ of *mandamus* against William Garrett, the Speaker of said House, requiring him, as such Speaker, to certify to the Comptroller of Public Accounts the amount insisted by the petitioner to be due to him for mileage, or *per diem*, or both, which accrued to him between the period of the adjournment of the General Assembly on the 20th December, 1853, and its reassembling on the 9th January, 1854.

We have had some difficulty as respects the jurisdiction of this court of original applications like the present; but, as the facts set forth in the petition, (and which are admitted by the Speaker,) very clearly show that, if the petitioner have any other remedy, which is questionable, that remedy may be thwarted, we have determined, under the peculiar circumstances of the case, to entertain jurisdiction of the motion. The case of The State, on the relation of the Attorney General v. Porter, 1 Ala. R. 688, although not directly in point, is strongly persuasive in support of our power to grant the relief prayed for.

The question to be decided is, whether, if the General Assembly, by a joint resolution of both houses, pending its regular session, adjourn on the 20th December, 1853, to meet again on the 9th day of January, 1854, the members who go home and return are entitled to mileage, or *per diem*, or to both.

By the 43d section of the Code, " the President of the Senate and the Speaker of the House receive six dollars, and the other members four dollars, for each day's attendance ; and are allowed four dollars for every twenty miles travelling to and from the General Assembly ; estimating the distance by the direct mail route, if any, and if not, by the land route usually travelled."

The 44th section provides, that, " If any member is detained by sickness, after leaving home, in coming to, or is unable to attend the House after he arrives at the seat of government, he is entitled to the same daily pay as an attending member.

The 45th section declares, that " The compensation due to the members and officers of the General Assembly, must be certified by the President and Speaker respectively, to the Comptroller of Public Accounts, who must issue his warrant therefor on the State treasury." So far as the right to *per diem* com-

pensation is involved, it must turn on the meaning of the words " each day's attendance," as used in the 43d section. It could never have been intended that the members of the legislature should receive pay for those days only on which they were actually engaged in the business of legislation ; and neither the language employed, nor the purposes of the statute, would force such a construction upon us.

A member may be engaged in attendance on the General Assembly, during periods of temporary cessations of legislative functions by the respective bodies ; and the *per diem* compensation was intended as a remuneration for the services of the members, as well as to provide for their expenses during the period they were required to be absent from their homes in attending to the duties of legislation, as those duties are usually and ordinarily performed. And the object in limiting this compensation to each day's attendance, was, to secure on the part of the member, who was not within the exemptions provided for by section 44, the performance of legislative duty during those days which the house to which he belonged deemed necessary to devote to the business of legislation. It was never intended that the members of the Legislature should not receive pay for Sundays, or pending temporary adjournments upon holidays, or on occasions of the death of a member. The practical construction of the law, from the organization of the government to the present time, has been otherwise, and we have no disposition to depart from it. These are not regarded as permanent cessations in the business of legislation, but in the nature of adjournments from day to day, when, in legal contemplation, the business is progressing. Indeed, it may often happen, that a temporary adjournment for a few days may tend to facilitate the business, since the committees may thus be afforded time to consider of and mature the matter of bills and resolutions referred to them. But when, as in the case before us, there is an adjournment for near three weeks—for such a period of time, as to afford a reasonable inference that it was designed, not to facilitate the business of the session, but to operate a cessation of it for the given period, that the members may return to their respective homes—it would appear absurd to say that a member was in attendance upon the General Assembly, when it was not convened, and could not be, until the period which it had fixed

for re-assembling had arrived. Thus much upon the question as to the *per diem.*

We come next to consider the right to mileage. By the amendment to the constitution, the members of the General Assembly are elected biennially ; and, according to section 32 of the Code, " The regular sessions of the General Assembly are held on the second Monday in November, 1853, and every two years thereafter." As the law now stands, there can be but one regular session every two years, and this session is closed when the Legislature adjourns *sine die.* But the Governor is authorized, by proclamation, on extraordinary occasions, to convene the Legislature, at the seat of government, or at a different place, if that shall have become, since their last adjournment, dangerous, from an enemy, or from contagious diseases ; and if the two houses shall not agree as to the time of adjournment, he may adjourn them to such time as he may think proper, not beyond the day of the next biennial meeting of the General Assembly.—Const. Ala., Ar. 4 § 8, and amendment. Here, then, we have provision for a regular biennial session, and for a special or called session by the Governor.

The constitution is silent as to the power of the Legislature to provide for a special session ; but it is a sound rule of construction, that, while the federal government can exercise no power not delegated by its constitution, either in express terms or by necessary implication, the State legislatures may exercise all powers falling within the legitimate scope of legislation not expressly or by implication denied either by the constitution of the State or of the United States. So that we conceive, there is no constitutional objection to the Legislature's providing, at a regular session, for a special or extraordinary session. Exigencies might arise, which would render the exercise of such power of the last importance to the State ; and we think it too clear to admit of any doubt, that, if the intervening time be so great as reasonably to require the dispersion of the members in going to and returning from such called or special session, whether convened by the Governor, or by an act or resolution of the general session, they would be entitled to mileage. We will not say but that the Legislature may provide for such special session, without the lapse of so much time between it and the regular session as intervened in the case before us. There

Ex Parte Pickett.

might be extraordinary emergencies requiring such legislation. Now, it is conceded by all, we believe, that for attendance upon such sessions, the members would be entitled to mileage. What, we ask, is the difference between such session, and the present session after the reassemblage upon the 9th day of January last, as respects the necessity for the members travelling to and from the General Assembly? The length of time between the adjournment and cessation of the business of legislation and the time fixed for re-convening, was so great, as to furnish a reasonable inference that it was contemplated the members should return to their respective homes and constituency. It may have been right and proper that they should so return, to be advised by their constituents respecting their will with regard to important measures before the General Assembly. Be this, however, as it may, we are not permitted to go behind the adjournment, to investigate the causes which led to it. This is a political question, which it was for the Legislature to decide, and with which we have nothing to do. We must intend that the ground for adjournment was sufficient, and the period which intervened was of such duration as reasonably to require the members to return home. When, therefore, they were going and returning, they were travelling to and from the General Assembly, within the meaning of the 43d section.

Our opinion, in short, is, that when an act of legislation (and an adjournment is such an act) involves the presumed necessity of the members returning to their constituents, they are entitled to their allowance for such travel, within the meaning of the law. It follows from what we have said, that the members are not entitled to *per diem* compensation, but are entitled to mileage.

The motion is accordingly granted as to mileage, but denied as to the *per diem*.