**HALL v. BLAN, State Treasurer.**

3 Div. 48.

Supreme Court of Alabama.

April 27, 1933.

Rehearing Denied June 9, 1933.

Horace C. Wilkinson, of Birmingham, for
appellant.

Thos. E. Knight, Jr., Atty. Gen., and John H. Peach, Legal Advisor to the Governor, of Sheffield, for appellee.

BOULDIN, Justice.

The bill was filed by Jewell C. Hall, as a taxpayer and teacher of a public school in this state, against S. H. Blan, as state treasurer of Alabama, seeking certain relief by injunction touching the disbursement of the public funds in the state treasury.

Filed in the circuit court of Montgomery

county, in equity, the bill was presented to Honorable Roger Snyder, a circuit judge of Jefferson county, for a preliminary writ of injunction. After a hearing the writ was granted. On motion the injunction was promptly dissolved or discharged by Honorable Leon McCord, judge of the circuit court of Montgomery.

Complainant appeals from both decrees: From the decree of Judge Snyder for denial of the full measure of relief prayed, and from the decree of Judge McCord for discharging the injunction as issued.

For purposes of clarity and exactness, rather than the usual order of treating questions raised on appeal, we consider the several matters wherein the treasurer was enjoined in numerical order as disclosed by the writ of injunction issued by Judge Snyder. ·

By such writ, the state treasurer of Alabama was enjoined and restrained from: "(1) Paying any member of the Legislature of Alabama more than four dollars per day and mileage for attendance on the special or extraordinary session of the Legislature of Alabama that convened on January 31st, 1933."

This challenges the constitutionality of the Act approved January 28, 1927 (Gen. Acts 1927, p. 26), purporting to give each member of the Legislature an allowance, not exceeding $4 per day, for "reasonable expenses incurred by him because of and while in attendance upon the sessions of the Legislature." We treat this as intended to cover personal expenses incurred in the performance of legislative duties, among which expenses are enumerated "stenographic work, telephone and telegraph service, clerk hire, stamps and like expenses."

Section 49 of the Constitution of Alabama 1901, reads: "The pay of the members of the legislature shall be four dollars per day, and ten cents per mile in going to and returning from the seat of government, to be computed by the nearest usual route traveled." This section first appeared as section 6, article 4, of the Constitution of 1875.

Reviewing the history of this constitutional provision, we note that long before it came into the Constitution, the statutes fixed what legislators should receive on a per diem and mileage basis. By the Code of 1852, § 43, the same per diem and mileage were prescribed as in the present Constitution.

This statute was construed in Ex parte Pickett, 24 Ala. '91, 95. In opinion by Chief Justice Chilton, this court said: " * * * The per diem compensation was intended as a remuneration for the services of the members, as well as to provide for their expenses during the period they were required to be absent from their homes in attending to the duties of legislation, as those duties are usually and ordinarily performed."

By an Act of February 19, 1867 (Acts 1866–

1867, p. 635), the per diem was made $6, and mileage 40 cents. Revised Code, § 49.

Thus matters stood when the Constitutional Convention of 1875 convened. Code of 1876, § 43.

In readopting and writing into the Constitution the same per diem and mileage basis fixed by statute prior to 1867, these terms are presumed to have been employed in the same sense given them by judicial construction in Ex parte Pickett, supra.

Again, the Constitution fixes the compensation or allowance of no other public official.

To relieve legislators of the responsibility of dealing with a matter in which they had a direct personal interest, the criticism, as well as the temptation, seems an obvious reason for dealing with the entire subject in the Constitution itself. This is in keeping with section 82 of the Constitution, declaring that ·a legislator having a personal or private interest in any measure shall recuse himself and not vote thereon.

Again, the rule that the inclusion of one item excludes others of the same class, is a well-recognized one in construing documents generally.

Obviously the mileage allowance was aimed to cover traveling expenses incident to service in the Legislature.

At the Session of 1878–79 (Acts 1878–79, p. 52), the Legislature made the statute conform to the Constitution of 1875, and so has every Code since then. Code of 1923, § 1521 (914) (2226) (43).

For more than half a century, we think it can be safely said, this section of the Constitution has been generally construed as fixing and withdrawing from legislative power, the matter of personal compensation and expense allowances to legislators while in attendance at legislative sessions. Such has been the widely prevailing construction of similar constitutional provisions in other states. Jones v. Hoss, Secretary of State, 132 Or. 175, 285 P. 205; State ex rel. Banker, State Representative, v. Clausen, State Auditor, 142 Wash. 450, 253 P. 805; Dixon v. Shaw, State Auditor, 122 Okl. 211, 253 P. 500, 50 A. L. R. 1232; State ex rel. Griffith, Attorney General v. Turner, State Auditor, 117 Kan. 755, 233 P. 510; Peay v. Nolan, Treasurer, 157 Tenn. 222, 7 S.W.(2d) 815, 60 A. L. R. 408; Peay v. Graham, Comptroller, 162 Tenn. 153, 35 S.W.(2d) 568; Ashton v. Ferguson, State Treasurer, 164 Ark. 254, 261 S. W. 624; State ex rel. Fox v. Raine, Auditor, 49 Ohio St. 580, 31 N. E. 741; · Fergus v. Russel, 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916B, 1120; Terrell, Comptroller, v. Middleton, 108 Tex. 14, 191 S. W. 1138, 193 S. W. 139; Leckenby, State Auditor v. Post Printing & Publishing Co., 65 Colo. 443, 176 P. 490; In re Advisory Opinion to Governor,

90 Fla. 708, 107 So. 366. There is a distinction, under our Constitution, between expenses of the Legislature, controlled by the legislative body, and expenses incurred by the member on his own account and at his discretion, within a maximum limit. For example, clerk hire is within the provisions of section 67, authorizing necessary employees; but their number, duties, and compensation are to be fixed by law.

■ We are therefore impelled to declare the act of 1927, supra, and the amendatory act of 1932 reducing such expense allowance to $3 per day (Acts Extra Session 1932, p. 48) to be unconstitutional, null, and void.

That the constitutional sums may be inadequate, under present conditions, is not for the courts to decide.

It follows that the bill has equity in this regard, and the temporary injunction on that phase of the bill was properly issued, and, as reinstated by order of Chief Justice Anderson pending the appeal, will continue in force.

■ Second. The writ of injunction following the decretal order of Judge Snyder further enjoined the treasurer from: "(2) Paying or permitting to be paid out of the public school funds of the State of Alabama accruing for the support and maintenance of the public schools of Alabama for the tax year beginning October 1st, 1932, or the appropriation from the Alabama special educational trust fund for the year beginning October 1st, 1932, any sum, either by way of interest or principal, on any of the following warrants" (warrants here listed in the writ) "and from paying any part of said public school funds accruing for the support and maintenance of the public schools for the tax year beginning October 1, 1932, or the appropriation from the Alabama special educational trust fund for the year beginning October 1st, 1932, other than for the support and maintenance of the public schools of the State of Alabama."

The warrants here involved are of three classes: First, a long list of warrants drawn on the "Public School Fund," otherwise known as "General Educational Fund," consisting of the proceeds of the three-mill tax specially allocated to public schools by section 260 of the Constitution, other minor items, and special appropriations to such general school fund from the general revenues of the state. All the warrants in this first list were drawn in favor of the several county boards of education on account of their respective apportionments of such fund under section 256 of the Constitution and statutes making it the duty of the auditor to certify to the state superintendent of education the total available funds at the beginning of each fiscal year, and the duty of the superintendent to make such apportionment and certify same to the county boards, who, in turn, enter into contracts with teachers on the basis of such public school income.

Such warrants were drawn, it appears, during the months of December, 1930, January, February, and March, 1931, for payment from the school funds of the fiscal year, October 1, 1930, to September 30, 1931.

Funds not being in hand to pay these warrants, resort was had to a device of long standing known as "Certificated Warrants," defined by the state auditor thus: "(A certificated warrant is one on which there is an agreement by the State with some bank or financial agent, that the latter shall pay full face value of the warrant to party in whose favor it is drawn, and then with certificate attached to warrant carry the same for a given period before presenting to Treasury for payment, interest on the same being paid from Governor's interest contingent fund. Certificated warrants have been used more or less in emergencies by many administrations.)"

It appears from the bill these warrants were certificated for payment August 25, 1931; that new certificates were later attached fixing the date of payment at February 25, 1932; that they were again extended in like manner to August 25, 1932; and finally one-half to January 25, 1933, and one-half to February 25, 1933.

It appears from the bill that these warrants, at the request of the Governor of Alabama, were cashed by an unnamed bank in the city of New York; that interest was paid on the several renewals out of the Governor's contingent fund, and there were still outstanding when the bill was filed such warrants aggregating $2,552,451.67.

It appears from brief of the Attorney General and the Governor's Special Counsel, on behalf of the state treasurer (and nothing to the contrary appears), that these warrants were taken by the bank at full face value, and the proceeds paid over to the several county treasurers of school funds, and used to pay teachers and keep the public schools open during the winter and spring of 1931.

The second list of warrants set out in the writ of injunction were drawn on the "general fund" in the state treasury, aggregating $1,150,195.08. Of these nearly half were payable to the Insane Hospital, School for Deaf and Blind, and Partlow State School. Others were payable to the several counties as their "bonus fund," to the Boys' Industrial School, the several Normal Schools, the University of Alabama, Alabama Polytechnic Institute, and Alabama College.

The third list, aggregating $603,084.30, was drawn on the "Alabama Special Educational Trust Fund," derived from certain excise taxes imposed by section 2 of the General Revenue Law of 1927 (Gen. Acts 1927, p. 139). By

subdivision 2-K (page 148) of the same act, the proceeds of such taxes are designated as "Alabama Special Educational Trust Fund," to be kept separate and apart from all other funds, and paid out on special appropriations from such fund for educational purposes.

The list of warrants drawn on this fund, and covered by the injunction, were all drawn in favor of the several Normal Schools and the three higher institutions of learning. We deem it just to say that so far as appears, the money obtained from the bank which cashed the warrants drawn on the general fund, as well as those drawn on the educational trust fund, was devoted to the purposes for which the warrants were drawn as above summarized.

All the three classes of warrants here enjoined were drawn on funds from which they were lawfully payable; and were within the appropriations made, or sought to be made, by the Legislature from said several funds.

The injunction is directed against the payment of any of these warrants out of the "general school fund" or the "Alabama special educational trust fund," coming into the treasury for the fiscal year beginning September 1, 1932. Such warrants as were drawn on the general fund cannot be paid out of these school funds as of course. Obviously warrants can be paid only from funds on which they are drawn.

The grounds alleged in the bill for enjoining the payment of warrants drawn on school funds, general or special, out of moneys coming into such funds for the fiscal year beginning October 1, 1932, are these: That the "certificated" warrants were made the basis of a loan or advancement of money, greatly in excess of the amount authorized by section 213 of the Constitution; that the transaction involved an illegal promise to pay interest thereon; "that if said warrants evidence a debt of the State of Alabama it was a debt contracted in violation of said section 213 of the Constitution; that if said warrants do not evidence a debt of the State of Alabama, then there is no warrant or authority of law for paying them out of the school revenue or educational funds of the State for the fiscal year beginning on October 1, 1932."

Further allegations disclose that by reason of excess of appropriations over incoming revenues from year to year, a deficit, aggregating some $20,000,000, has accumulated, represented by outstanding warrants, of which some $16,000,000 are for payment of teachers, and other educational outlays; that the school revenues coming into the state treasury for the year beginning October 1, 1932, are inadequate for the payment of current appropriations; that public schools are being closed for want of funds; that payment of these certificated warrants will further deplete such funds, and be an unwarranted discrimination against other holders of similar warrants.

We deal first with the second alternative ground for injunction, viz., the want of authority to pay warrants drawn against appropriations made for the fiscal year beginning October 1, 1930, out of revenues for the fiscal year beginning October 1, 1932, thereby consuming funds levied and appropriated for current school purposes. Apart from the constitutional inhibition against debt, we find no such authority.

Constitutional provisions, sections 256, 258, 259, 260, and 261, all look to keeping open a system of public schools from the funds provided for that purpose from year to year.

It is not contemplated that school facilities shall be so enlarged for one or more years as to anticipate and consume, in advance, funds provided for schools of future years during which the money is paid into the state treasury. Our statutory system of apportionment in keeping with section 256 looks to no apportionment and drawing of warrants thereon save for the current year for which such revenue is in process of collection.

In Farned v. Bolding, Superintendent of Education, 221 Ala. 217, 219, 128 So. 435, 436, construing another statute, this court gave expression to views we think apt as addressed to all public officers having duties to perform in relation to our public schools, as follows:

"Still, a stronger and more imperative policy of justice demands that he who pays the tax shall have the benefit of same.

"To pay a tax which has been anticipated and used in the education of children seven years in the past and increased by a carrying charge by way of interest is not in keeping with such policy.

"The law contemplates a budget confining expenditures to the funds reasonably in prospect.

"Maybe some indebtedness will develop despite all reasonable efforts to prevent; but no policy of making debt to be taken care of by others who may have received no benefits therefrom is to be found in our statutes. Each recurring period has burdens all its own, and every care should be observed not to pass the burdens of one period on to another."

Turning to the warrants here enjoined, payable from the educational trust fund, we observe they were drawn against appropriations made for the fiscal year beginning September 1, 1930, by the Appropriation Act of August 25, 1927 (Gen. Acts 1927, p. 442).

Whether drawn on appropriations under section 13 or section 14 of that act, or both, does not appear. By section 14½ of the act all such appropriations are made conditional in that they were payable from time to time on the approval of the Governor as in his

opinion the condition of the treasury should warrant. By the same section it is provided that unpaid balances on such appropriations should continue in force until paid in full in the manner provided in such section; that is to say, on approval of the Governor, when the condition of the treasury warrants such payment. By section 31 of such act it is provided that if the trust fund is insufficient to pay such appropriations, any balance shall be payable out of any other funds in the treasury not otherwise appropriated.

But the funds protected by injunction are the trust funds coming into the treasury for the fiscal year beginning October 1, 1932. These funds are governed by the Appropriation Act approved November 9, 1932 (Acts Extra Session 1932, p. 288), wherein large specific appropriations are made from this fund for the fiscal year beginning October 1, 1932; and such appropriations are payable solely from the Alabama special educational trust fund, no portion being payable out of the general fund of the state.

As of course, the amount coming into this trust fund during this ensuing fiscal year is not shown. From the entire record, it reasonably appears it will not be sufficient to meet the appropriations under the act of 1932, supra.

On the showing that notwithstanding such facts, the treasurer was about to pay out such fund on the old warrants here involved, the injunction was properly granted as per paragraph No. 2 of the temporary writ, and the same will be reinstated as issued.

■ By paragraph or order No. 3 of the writ, the treasurer was enjoined from "(3) Paying out any money from the Alabama special educational trust fund for any purpose other than educational purposes, and from consolidating, mingling or confusing the general educational funds of the State of Alabama and the Alabama special educational trust funds with other funds in the State Treasury."

It fully appears that the practice of consolidating all funds as paid into the treasury has been long in vogue. This is a practice not authorized by law. As for funds devoted by the Constitution to specific purposes, no legislative act could make it lawful to commingle such funds with others, resulting in diverting any part of same to other purposes, however lawful, as regards funds from which they may be paid. The Constitution governs both the legislative and executive officers. As to special funds raised by legislation and devoted to specific purposes, the Legislature, not executive officers, determines the purposes to which they should be applied.

It is suggested by the Attorney General this practice has been abandoned; that under the Fletcher Bill all funds are kept separate, and no occasion now exists for such injunction. It appears that by a separate act the warrants in question have been removed from the influence of the Fletcher Bill.

■ In any event, in the light of the disastrous conditions arising from such disregard of law prior to the Fletcher Bill, we deem it proper to give full expression to our condemnation of such practice. Every fund in the treasury should be set up on the treasurer's records so as to show receipts and disbursements thereof, and no warrant, drawn against such fund, be paid, unless there is a balance of such funds on hand, as well as a lawful appropriation, as required by the Constitution, § 72.

Paragraph No. 3 of the temporary writ above, reinstated by Chief Justice Anderson, will be continued in force.

■ Injunction order No. 4, embodied in the temporary writ, enjoined the treasurer from "(4) Paying out any money now in the state treasury of the State of Alabama, or hereafter received by you as state treasurer of the State of Alabama for any purpose whatsoever except the payment of salaries of the officers and employees of the judicial department of the State of Alabama; the payment of Confederate pensions, and the payment of interest or principal on Alabama road bonds, until the sum of $406,547.56, exclusive of revenue collected since October 1, 1932, shall have been restored to the Alabama Special Educational Trust Fund and is disbursed for educational purposes, as required by law; and until the sum of $2,993,529.44, shall have been restored to the general educational fund and disbursed for educational purposes, as required by law. The purpose of this paragraph being to require the restoration of said respective sums to said respective funds before allowing or permitting you to disburse money now in the state treasury or that is subsequently paid into the state treasury for any purpose except those excepted in this order until such restoration of funds is accomplished and the funds restored are disbursed for educational purposes as required by law."

The bill sufficiently discloses that special educational trust funds and general education funds had, by reason of the consolidation of funds, and great shortage of revenues to meet appropriations, been diverted to other purposes as declared in this writ.

The record contains a report from the state treasurer, saying "the State issued during the fiscal year 1930–1931 aggregate warrants to the extent of about $7,803,664.12 in excess of Treasury receipts; during the fiscal year 1931–1932 excess warrants for $2,625,-576.77 or about $10,429,280.89 in excess of Treasury receipts during these two fiscal years alone. It will be readily seen that the Treasury could not meet all warrants."

The warrants issued for the fiscal year 1930–31, were against appropriations made by the Legislature of 1927, and those issued for the fiscal year 1931–32 against appropriations made by the Legislature in 1931 and 1932, except some against continuing appropriations made prior to 1927.

The diverting of school funds, leaving school teachers unpaid, as disclosed by the bill, fully justified a feeling on the part of Judge Snyder that a strong temporary injunction should issue.

But it is equally obvious that this order No. 4 was ill advised. To tie up all the funds in the state treasury, stop the payment of lawful governmental expenses out of moneys levied, collected, and appropriated to other lawful purposes, in order to recapture school funds, was wholly without warrant of law. It would mean the diverting of funds from their lawful purpose, the very thing complained of in the bill.

The decree concluded: "This order is made without prejudice to the right of the respondent to apply to the Circuit Court of Montgomery County, Alabama, in equity, from time to time and as often as may be necessary for a modification of this order to allow special payments for specific purposes not enumerated herein to meet any extraordinary situation that *the future* may develop."

This did not cure the ' order virtually strangulating government operations. The Montgomery circuit court would thus usurp the function of running the state government, ousting the officers provided by law.

Judge McCord very properly and without delay dissolved or discharged this feature of the injunction.

█ Judge Snyder properly denied the prayer of the amended bill seeking to enjoin the treasurer from paying members of the Legislature their lawful per diem and mileage upon warrants duly issued, as a means of recapturing the money paid them at former sessions pursuant to statute which we have herein declared unconstitutional. This, for the reason that no law imposes such duty, nor confers such authority, on the treasurer.

█ Section 817 of the Code imposes a duty on the state auditor, not on the state treasurer. That section is limited to an officer charged with the handling of state funds, and who had become a defaulter, guilty of a breach of trust imposed on him by law. State ex rel. Moniac v. Brewer, Auditor, 62 Ala. 215.

█ The amended bill further sought to enjoin further payment of per diem of subordinate officers and clerks of the Senate and House of Representatives alleged to be in excess of the number authorized by law.

This feature of the bill challenges the validity of the Act of January 17, 1927 (Gen. Acts 1927, p. 15), and the Act of February 20, 1931 (Gen. Acts 1931, p. 67), purporting to authorize each House to fix the number and compensation of such employees by resolution.

These acts are alleged to be in violation of section 67 of the Constitution, saying: "The legislature shall prescribe by law the number, duties, and compensation of the officers and employees of each house, and no payment shall be made from the state treasury or be in any way authorized to any person except to an acting officer or employee elected or appointed in pursuance of law."

Section 61 of the Constitution declares: "No law shall be passed except by bill." We need not repeat the well known constitutional requirements or safeguards for the passage of bills.

Section 67 is among the constitutional provisions safeguarding the people of the state against excessive expenses of legislative sessions.

The Legislature cannot confer on each House the power to make laws by resolution.

We take note, however, that at the Special Session of 1933, by Act approved March 8, 1933, the Legislature has repealed the statutes under which the abuses set out in the bill arose; hence there is no occasion now for injunctive relief in this regard.

█ We have deferred to this point a consideration of that feature of the bill challenging the transactions involved as violative of section 213 of the Constitution.

This section declares: "After the ratification of this constitution, no new debt shall be created against, or incurred by this state, or its authority * * * provided, the governor may be authorized to negotiate temporary loans, never to exceed three hundred thousand dollars, to meet the deficiencies in the treasury, and until the same is paid no new loan shall be negotiated." Other provisions of the section are not pertinent here.

This section appeared as section 3, Article 11, of the Constitution of 1875, under conditions which are matters of history. The only change in the Constitution of 1901 is an increase of authorized temporary loans from $100,000 to $300,000.

This section is so clear and explicit that its import cannot well be questioned. It demands that the state of Alabama shall be run on a pay as you go basis: in modern terminology, "on a balanced budget."

It withdraws from every department of the state government any power to run the state into debt. The state, and every official thereof, is put under an absolute disability to incur debt, except as therein specified. The Legislature cannot create debt by appropriations in excess of revenues, by the creation of

new offices, by expanding the functions of government, nor by enlarging the activities of its departments, however important, or however insistent the public demand. Nor can executive officers create debt by issuance of warrants pursuant to appropriations, notwithstanding the holder has rendered a public service, advanced money, or materials for governmental uses on the faith that the state, through its constituted authorities, would provide the means of payment. We here take note of an argument that an advisory opinion, In re Opinions of the Justices, 220 Ala. 539, 126 So. 161, recognizes the power to incur debt by excess appropriations. The argument is groundless. The very inquiry answered limited the proposed loans to the "income."

As well said by the New York Court of Appeals in People ex rel. Hopkins v. Board of Supervisors of King's County, 52 N. Y. 556: "It is not in the power of a legislature to add to the debt of the State by extravagant and excessive appropriations, and at the same time keeping up a show of economy by imposing minimum taxes. The treasury cannot be embarrassed or the people burdened by debt in such form."

This court has had occasion several times to consider what constitutes "debt" as applied to the constitutional limitation on county indebtedness. Hagan v. Commissioner's Court of Limestone County, 160 Ala. 544, 49 So. 417, 37 L. R. A. (N. S.) 1027; Gunter v. Hackworth, 182 Ala. 205, 62 So. 101; Brown, Treasurer, v. Gay-Padgett Hardware Co., 188 Ala. 423, 66 So. 161; Southern Railway Company v. Jackson County, 189 Ala. 436, 66 So. 570; O'Rear v. Sartain, 193 Ala. 275, 69 So. 554, Ann. Cas. 1918B, 593. For general discussion, see 59 C. J. p. 223, § 369 and notes; Ib. pp. 251, 252, § 391; Ib. p. 218, § 354; Ib. p. 214, § 351.

In keeping with authorities of other states, and with the spirit of such limitations and the practical operation of government thereunder, we have declared that current obligations within the revenues levied and assessed, and in process of collection, are not debts merely because such revenues have not yet come into the treasury. They are considered as constructively in the treasury. Brown, Treasurer v. Gay-Padgett Hardware Co., supra.

We see no occasion to give the term "debt" a different meaning as applied to county and state matters. What are current revenues in a state, like ours, where revenue bills and appropriations are made at quadrennial sessions, is a question we need not now determine.

The bill in this regard is directed to whether the state treasurer shall be enjoined from paying specific warrants out of specified funds of the current year.

A taxpayer may maintain a suit to enjoin the state treasurer from diverting public funds, or disbursing same for unlawful purposes. He has a direct interest in seeing that taxes paid are devoted to the ends provided by law. While early decisions in some states sought to differentiate between state and county officers in such suits, the great weight of authority now recognizes this remedy. See extended note reviewing authorities in 58 A. L. R. page 589. A later case is found in Borden et al. v. Louisiana State Board of Education et al., 168 La. 1005, 123 So. 655, 67 A. L. R. 1183.

The question of necessary parties is not involved on the present appeal, dealing with a temporary injunction. Such question properly arises on demurrer. Baisden v. City of Greenville, 215 Ala. 512, 111 So. 2.

The order of Judge McCord will be reversed in part and in part affirmed. The temporary injunction will be re-instated and remain in force pending the suit to the extent indicated in this opinion.

On the appeal from Judge Snyder's decree denying further injunctive relief, such decree is, to that extent, affirmed.

Affirmed in part, reversed in part, and remanded.

All the Justices concur, except THOMAS, FOSTER, and KNIGHT, JJ., who dissent on special grounds stated by them, respectively.

ANDERSON, Chief Justice (specially concurring).

While I concur in the conclusion and most of the opinion of Bouldin, J., and of Foster, J., in the case of Turnipseed v. Blan, Treasurer (Ala. Sup.) 148 So. 116,[1] I do not think that the question of whether or not these outstanding warrants for past years are debts, as forbidden by section 213 of the Constitution, should remain undecided. Owing to the conditions now confronting us, with an outstanding indebtedness of approximately $20,000,000, it is highly important that this question be decided.

Section 213 of the Constitution reads as follows: "After the ratification of this constitution, no new debt shall be created against, or incurred by this state, or its authority, except to repel invasion or suppress insurrection, and then only by a concurrence of two-thirds of the members of each house of the legislature, and the vote shall be taken by yeas and nays and entered on the journals; and any act creating or incurring any new debt against this state, except as herein provided for, shall be absolutely void; provided, the governor may be authorized to negotiate temporary loans, never to exceed three hundred thousand dollars, to meet the

[1] 226 Ala. 549.

deficiencies in the treasury, and until the same is paid no new loan shall be negotiated; provided, further, that this section shall not be so construed as to prevent the issuance of bonds for the purpose of refunding the existing bonded indebtedness of the state."

The manifest purpose and meaning of this provision of our organic law is that the state government should function on a cash, or pay as you go, basis, plus a margin of $300,000, given the Governor as an emergency fund. In other words, that the cost of government must not exceed the current revenue, plus a margin of $300,000. This being true, a compliance with this important provision would prevent any deficit past, present, or future. It must be noted that this provision pronounces as void any act creating or incurring any new debt against the state.

It is therefore my opinion that all outstanding warrants in excess of the revenue for the current fiscal year or the issuance of same are void under the express terms of section 213 of the Constitution and cannot be paid except by a ratification of same by an amendment or modification of said section 213.

There may be a moral obligation to adjust these claims, but appeal must be made to the voters of the state to amend or modify section 213 at the polls and not to the court.

THOMAS and KNIGHT, Justices (dissenting in part).

We are of the opinion that the parties who hold the warrants, payment of which the bill seeks to enjoin, are vitally and immediately interested in the decision of the case, and we do not think that this court, in the absence of the real controversial parties, should proceed to determine the equities of the case until they are properly before the court. The effect of the decisions in the two cases, which were argued and submitted together, is the prejudgment and predetermination of the issues involved, in the absence of admittedly interested parties. This, we submit, is not according such parties that due process of law guaranteed to them.

We concur in that part of the opinion of Mr. Justice BOULDIN, which deals with the pay of the members of the Legislature, because, at the time of the filing of the bill, so far as we are advised by the bill, no warrants were outstanding, and the bill sought to enjoin only warrants to be issued in the future contrary to law.

FOSTER, Justice (dissenting in part).

The Act of 1927 (Gen. Acts 1927, p. 26) by whose authority certain expenses of the members of the Legislature are sought to be enjoined, provides for the payment of their reasonable expenses while in attendance upon the sessions of the Legislature, which expense shall, among other things, include stenographic work, telephone and telegraphic service, clerk hire, stamps, and like expenses.

With respect to the cases cited in the majority opinion, we find the following situation:

In Jones v. Hoss, 132 Or. 175, 285 P. 205, the opinion recites that the bill alleges that the warrants whose payment are sought to be enjoined "are not for the payment of officers, clerks, stenographers, stationery, postage, or other general and contingent expenses * * * or any part thereof." The court said that the limitation against personal expenses has no application to official or legislative expenses. Drawing the distinction between personal and official expenses, it is said that the latter "are those that are necessary to enable the Legislature to properly perform its functions, while those that are personal are those that must be incurred by a member of the Legislature in order to be present at the place of meeting—expenses for his personal comfort and convenience." That case only involved *living expenses*, such as board and lodging.

In State ex rel. Banker v. Clausen, 142 Wash. 450, 253 P. 805, 806, there was a provision to pay each member $5 a day "for expenses incurred in attending the session of the Legislature at the state capital." The holding was that it showed "an attempt to withdraw money, appropriated for legislative expenses, for the *personal use and benefit of the individual members of the House*" (italics supplied). The constitutional provision was similar to ours in all material respects. It was held to preclude an allowance for personal expenses, but not for official expense.

In Dixon v. Shaw, 122 Okl. 211, 253 P. 500, 504, 50 A. L. R. 1232, the inquiry only related to what was called purely personal expenses —hotel room rent and meals and other living expenses. It held that there was no inhibition against legislative expenses, and quoting from the Kansas case (State v. Turner, 117 Kan. 755, 233 P. 510) referred to such expense as being "whatever amount in its judgment is necessary therefor, under the prevailing conditions of life, [and] is a matter within the determination of the Legislature, and over which the courts can and would exercise no control," and that the distinction is that "legislative expenses are those that are necessary to enable the Legislature to properly perform its functions, while those that are personal are those that must be incurred by a member of the Legislature in order to be present at the place of meeting * * * expenses for his personal comfort and convenience."

In Peay v. Nolan, 157 Tenn. 222, 7 S.W.(2d) 815, 819, 60 A. L. R. 408, the same question was involved and the same legal result reached, with this additional thought that "To sustain an appropriation in gross as an

allowance for expenses and not a forbidden increase of compensation, the sum must be within such reasonable limits as to authorize the conclusion that the sum in gross might be covered by a certified statement of the official expenses incurred by the designated beneficiary," but if so large as to show a purpose to increase compensation, without regard to such actual expenses, it is in violation of the Constitution, similar to ours in that respect. And $750 in gross for seventy-five days was an increase in compensation, though, declared to be for official expense.

In another Tennessee case (Peay v. Graham, 162 Tenn. 153, 35 S.W.(2d) 568), the act appropriated $100 to each legislator "for stenographic hire and other extraordinary official expenses necessarily incurred by each member" at a twelve-day special session, and declared "as a fact that every member * * * has expended, at this extra session, at least the amount above set out for the official expenses above mentioned." It was held that it could not be reasonably assumed that each member incurred such an amount for official expense. But the court clearly and emphatically declared that the members of the Legislature may be reimbursed for their official expenses such as they may legitimately incur to be ascertained and determined by such reasonable method as its wisdom may suggest.

In Ashton v. Ferguson, 164 Ark. 254, 261 S. W. 624, the act appropriated $100 to each member for stamps, telephone, telegraph, and other necessary expenses. The Constitution provided that they "shall receive no compensation, perquisite or allowance whatever, except as herein provided." It was held to be in plain violation of the Constitution, and distinguished from State v. Thomason, 142 Tenn. 527, 221 S. W. 491, on account of the difference in the clauses of the Constitution; Tennessee not having a similar clause to that just quoted in Arkansas.

In Re Advisory Opinion, 90 Fla. 708, 107 So. 366, the allowance was "an additional amount for necessary extra expenses not to exceed four dollars per day." It was merely said that it was in excess of the limitations in the Constitution. The Constitution had provisions similar to ours. We note that this was paid regardless of the official expenses of the members incurred or paid by them.

The cases of State ex rel. Fox v. Raine, 49 Ohio St. 580, 31 N. E. 741; Fergus v. Russel, 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916B, 1120; Terrell v. Middleton, 108 Tex. 14, 191 S. W. 1138, 193 S. W. 139; Leckenby v. Post Printing & Publishing Co., 65 Colo. 443, 176 P. 490, relate to the subject in general terms, and do not aid otherwise in reaching the result.

In the case of State v. Thomason, 142 Tenn. 527, 221 S. W. 491, 495, with a constitutional provision similar to ours, an act appropriated $150 to each member "for stenographic work and other necessary expenses." Each member was shown to have incurred expenses for stenographic hire, postage, stationery, and attendance upon committees. It was claimed that because the appropriation also covered other expenses, that it attempted to include personal and living expenses. It was said that: "It is always to be presumed that the Legislature acted in good faith and within constitutional limits; and this declaration of the Legislature is a conclusive finding of fact and imports a verity upon its face which cannot be impugned by litigants, counsel, or the courts, but is absolutely binding upon all. 12 Corpus Juris, 799, 800, 6 R. C. L. 112," and cites some Tennessee cases.

This means that because the act included other expenses, it did not mean personal living expenses, but only official expenses. We have shown that in later cases in that court the rule was limited so as not to apply if the amount was so exorbitant as to manifest a purpose to evade the constitution, and include more than official expense.

From all of this, it is clear that the Legislature may provide for the payment of reasonable official expense, but not that which is personal, as defined in the cases cited.

When in our Pickett Case, 24 Ala. 91, it is said that the per diem allowance was intended for compensation and expense, it meant personal expense. Expense of travel, mileage, is a personal expense. Its inclusion would not exclude official expense, which is based on a different principle.

We note that no amount in gross is fixed, but only a maximum of $4 per day (now $3, Acts of Special Session 1932, p. 48). The items embraced are, "reasonable expense incurred by him because of and while in attendance upon the sessions of the legislature, which expense shall, among other things, include stenographic work, telephone and telegraph service, clerk hire, stamps and like expense." My view is that when properly interpreted, this was not intended to include personal expenses as defined in the cases cited above, because, for one reason, the doctrine of "ejusdem generis" seems applicable in this connection. Under that principle, "where general words follow the enumeration of particular classes of persons or things the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." 59 Corpus Juris, 981; State v. Western Union Tel. Co., 196 Ala. 570, 72 So. 99; Martin v. State, 156 Ala. 89, 47 So. 104. But if its terms, when properly construed, should be held to include personal expense, it is simply invalid to that extent.

The bill was filed before the last special session convened and in anticipation of its sitting, before any claim for contemplated expense was or could be made by any member under the act of 1927, as amended in 1932.

Its purpose is to prohibit payment to the members of any sum on any account as authorized by that act, even though such amounts be only for legislative, not personal, expenses. All authorities cited in the majority opinion agree that legislative expense may be provided without violating the constitution.

We cannot assume, and the bill does not allege, that all legislative expense will be, or has been, otherwise provided, and that the expense accounts of members will include personal items. It is not alleged that the members will not in the future act in good faith, but will improperly include personal expense items. This would not be a proper assumption or inference, even if members may have in past sessions misunderstood their rights and included items of personal expense with the approval of their respective presiding officers.

The bill does not deal with a proposed violation of the legal authority of the Act of 1927, but deals with the validity of the Act in its entirety. The act is not invalid to the extent that it provides for legislative expense. If it provides also for personal expense, it is only invalid to that extent. It is quite different from one which fixes a sum in gross, which includes expenses of both kinds, so that the legitimate cannot be separated from that which is illegitimate. If its language is broad enough to cover illegitimate items, the proper judicial attitude toward it is simply to hold that those which are illegitimate shall be excluded, if any, but not to strike down the act and prohibit the withdrawal of legitimate items of expense because it may be feared that others will also be included. On this point I cannot concur in the majority opinion, but I do in other respects.