This case involves the grant of a directed verdict by the trial court.
Wendell and Illa Haddox (sellers), as owners of certain real property located in Baldwin County, Alabama, known as the Terry Cove Marina, negotiated with Cecil L. and Margaret Ann Murphy (purchasers), for the sale of the marina. A sales contract, signed on June 15, 1978, called for a sales price of $650,000, with the purchasers paying $190,000 at closing and sellers financing the remaining $460,000, secured by a first mortgage on the marina. As provided in the contract, sellers were given $10,000 as a deposit and the closing was scheduled for August 31, 1978.
An amendment to the contract, prepared by sellers' attorney, was later signed by the purchasers and sellers. In the amendment, sellers agreed to subordinate the purchase money mortgage to any loan the purchasers obtained from a lender in the amount of $340,000. The loan closing date was extended to October 16, 1978, and sellers were paid $75,000 in addition to the $10,000 received earlier.
The sale was not closed on October 16, but on November 10, 1978. Present at the closing were Wendell and Illa Haddox, Cecil L. and Margaret Ann Murphy, the Haddoxes' attorney, the Murphys' attorney, and attorneys and representatives of First National Bank of Mobile (FNB) and First Alabama Bank of Montgomery (FAB).
Several instruments were executed on the closing date. Wendell and Illa Haddox conveyed the marina to Sportsman Marina, Inc. (Sportsman) by warranty deed and received a promissory note in the amount of $460,000 from Sportsman secured by a mortgage on the marina. (In accordance with the provisions of the June 15, 1978, contract, title to the property was taken in the name of Sportsman, and not the purchasers.)
Sportsman executed a mortgage to FNB as security for a $340,000 loan and sellers signed an agreement subordinating the mortgage held by sellers on the marina, to FNB and FAB. Purchasers, Sportsman and FAB executed a commitment agreement, while FNB, FAB, the purchasers and Sportsman executed a loan agreement. *Page 1228 
At the closing, the sellers received $105,000 from the purchasers, making the total amount received by sellers from purchasers $190,000. The remainder of the $650,000 purchase price was to be paid in two annual installments of $80,000, due in January of 1979, and January of 1980, and ten annual installments of $30,000, plus interest, beginning in January 1981.
In September 1979, Terry Cove Marina was severely damaged by Hurricane Frederic and suffered a substantial decline in value. On November 27, 1979, Sportsman defaulted on the loan and FAB took assignment of the loan from FNB pursuant to the "take-out" provision of the loan agreement. The sellers received the second $80,000 payment in January 1980, but have received no further payments from Sportsman or the purchasers. FAB contacted the sellers by telephone in February 1980, and requested that they enter into another subordination agreement in favor of a loan from FAB to Sportsman. Sellers, however, refused.
In February 1981, sellers borrowed money from the Farmers 
Merchants Bank of Foley, Alabama (F M), and used the promissory note of Sportsman, secured by the mortgage on the marina, as security for the loan. On September 1, 1981, F M filed suit against the sellers, the purchasers, Sportsman, FAB, FNB, and six other named defendants. In its complaint, F M alleged that it was the holder of a promissory note secured by real property known as Terry Cove Marina, and that the named defendants had a promissory note secured by real property known as Terry Cove Marina, and that the named defendants had an interest in the property. F M requested that the trial court determine the priorities of any indebtednesses secured by the property, order the property sold, and ascertain the amount of any deficiency in a judgment against the sellers, the purchasers, and Sportsman.
FAB answered the complaint, and counterclaimed and cross-claimed, alleging that it was holder of a lien superior to claims by any other parties to the action and requested that the court sell the property with the proceeds from the sale to be used to repay it first. The sellers answered the complaint, raising affirmative defenses; the purchasers and Sportsman answered the complaint by denying all allegations in the complaint. The sellers responded to FAB's cross-claim, alleging fraudulent inducement by FAB to subordinate sellers' first mortgage on the marina, contending that laches barred FAB from asserting that its mortgage was prior to sellers' mortgage on the marina, and arguing that FAB had failed to provide the required notice to sellers of Sportsman's default. The sellers also filed a cross-claim against FAB in which they alleged that they were defrauded in the transaction; they sought damages, and later amended their complaint to include two counts of breach of contract and amended their answer to assert an affirmative defense of bad faith. FAB answered the seller's cross-claim and raised as affirmative defenses the statute of limitations and preclusion of oral statements by written memoranda. A motion for summary judgment filed by FAB was denied by the trial court.
A separate jury trial, as requested by the sellers, was had on the cross-claim. A directed verdict for FAB on all counts resulted, and this appeal by the sellers followed, pursuant to the provisions of Rule 54 (b), Ala.R.Civ.P.
 I
The sellers assert that FAB had a duty to require purchasers, as owners of other lands located in Monroe County, to substitute this land as collateral for the mortgage on the marina, thereby permitting sellers to resume a first mortgage position. The sellers contend that FAB's failure to require the purchasers to do so resulted in the breach of a contract of which the sellers were third-party beneficiaries.
Whether a contract is ambiguous is a question of law for the trial court. Mass. Appraisal Services, Inc. v. Carmichael,404 So.2d 666, 673 (Ala. 1981). When the terms of a contract are clear and certain, *Page 1229 
it is the duty of the court and not the jury to analyze and determine the meaning of the contract. C.F. HalsteadContractor, Inc. v. Dirt, Inc., 294 Ala. 644, 649,320 So.2d 657 (1975). Moreover, two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract. Cole v. Yearwood, 241 Ala. 437,443, 3 So.2d 1, 2 (1951).
Having reviewed all the documents in question, i.e., the loan agreement, the commitment agreement, the promissory note, and the mortgage, we conclude that the terms were sufficiently clear to permit the trial court to construe the contract.
The rule with regard to third-party beneficiary contracts is that one who seeks recovery on a contract as a third-party beneficiary must establish that the contract was extended for his direct, as opposed to his incidental, benefit. Holley v.St. Paul Fire Marine Ins. Co., 396 So.2d 75, 80 (Ala. 1981);Sly v. South Central Bell Tel. Co., 387 So.2d 137, 139 (Ala. 1980).
Based on the terms of the several parts of the agreement, the trial court was authorized to find that the sellers were not third-party beneficiaries. Indeed, paragraph six of the commitment agreement provides:
 "Parties hereto agree that FNB is a third party beneficiary of this agreement, and the parties further agree that FNB shall be entitled to specific performance hereof."
Applying the familiar bromide expressio unius est exclusioalterius, as it applies to the construction of documents, we conclude that the inclusion of FNB as a third-party beneficiary under the express terms of the agreement indicates that others of the same class, including the sellers, were to be excluded as third-party beneficiaries. See Hall v. Blan, 227 Ala. 64,68, 148 So. 601 (1933).
 II
Whether a representation is made willfully, recklessly, or mistakenly, the critical elements of fraud include: (1) a false representation, (2) concerning a material existing fact, (3) upon which the plaintiff has relied, and (4) has been damaged as a proximate result. Burroughs Corp. v. Hall Affiliates,Inc., 423 So.2d 1348, 1353 (Ala. 1982).
As evidence of the alleged fraudulent representation, the sellers offer the following testimony:
 "Q. Mr. Haddox, I think when the objection was made, you had testified that some few weeks prior to August 31st, 1978 that you had spoken to Doctor Murphy [purchaser] and Jack Eley [officer of FAB] at your marina, the Terry Cove Marina?
"A. That is true.
 "Q. And let me ask you again. Why did Jack Eley say he was there?
 "A. He came to explain to me that the First Alabama Bank of Montgomery couldn't, for some reason, make the loan to Doctor Murphy and it was going to be made by First National Bank of Mobile.
 "Q. Now, just a minute, which loan are we talking about?
 "A. The $340,000 loan that was to be made for the down payment.
"Q. All right.
 "A. He said that the First National Bank of Mobile had agreed to let First Alabama Bank to let Cecil [Murphy, purchaser] have the money for First Alabama Bank for one year.
 "And that they would take it if I would subordinate my mortgage to them for a year. That they had to be in a first position for that one year until First Alabama could take it back.
"Q. What was your reply to this?
 "A. That I couldn't see any reason why it couldn't be done but that I would talk to my attorneys on it.
"Q. And did you end up agreeing to subordination?
"A. Yes, I did. *Page 1230 
 "Q. Did Jack Eley say anything to you with respect to your liability under any subordination agreement?
 "A. That it would be for a year before they could buy it back from First National Bank and that if it was bought back in a year that they would get additional land for additional security from Cecil Murphy to make up the money that they were letting him have.
 "Q. Did Jack Eley indicate at that time that you would be back in a first mortgage situation?
"A. Yes, he did."
The sellers further allege that the following testimony of Murphy is evidence that Jack Eley, as an officer of FAB, had no intention of fulfilling his representations to the seller:
 "Q. Now, Mr. Murphy, with respect to the financing involved in the purchase of the Terry Cove Marina, did you have conversations with Mr. Jack Eley?
"A. That is correct.
 "Q. Was Mr. Eley acting on behalf of First Alabama Bank at that time?
"A. That is correct.
"Q. You were working with him to get financing?
"A. That is correct.
 "Q. Now, were you familiar with the terms of Paragraph 7 of the commitment agreement which says, `The Murphys further warrant that they will not undertake the sale or otherwise encumber said Monroe County real property during the term of the hereinabove said loan agreement.'
"A. Yes, I've seen that.
 "Q. What did this thing require to you when you read it?
"MR. SIMPSON:
 "Your Honor, we are going to object again to — (interrupted)
"MR. GRANADE:
"I will withdraw the question.
"BY MR. GRANADE:
 "Q. Mr. Murphy, when you first came to me with this clause, did you ask Mr. Eley about it?
"A. Yes, sir.
"Q. What did you tell him?
 "A. I just more or less asked him and told him that I could not tie up my property because I had to have capital assets. I had invested all my money in buying the property.
"Q. What was Mr. Eley's reply to you about that?
 "A. He said, `Don't worry about that, we will work something out.' We wouldn't tie up my inherited property or anything like that."
The evidence is uncontroverted that on June 15, 1978, the purchasers and sellers signed a contract for the sale of the marina. By its terms, the contract was assignable to Sportsman with purchasers retaining the right to demand specific performance of the contract. There was no mention of FNB or FAB in the instrument nor any qualifications as to any other conditions, except that the purchasers agreed to endorse any note in the event the contract was assigned to Sportsman.
The exact date the amendment to the contract was executed does not appear from the facts. The sellers testified at the trial that the amendment had not been signed prior to the discussion with Eley, though Mr. Haddox previously stated in his deposition that the amendment containing a subordination provision was signed upon the advice of his attorney, prior to any conversations with Eley. By the terms of the amendment, the sellers agreed for a valuable consideration to subordinate a mortgage on the marina to a "purchase money mortgage not to exceed $340,000, that [purchasers] may give to bank or lender."
From the record it is clear that all alleged representations made by Eley to the sellers concerning the position of FNB, the subordination of the mortgage to sellers for one year only, and other lands pledged by purchaser for collateral were incorporated in the agreements executed by the parties after a review by their respective attorneys. *Page 1231 
We conclude that under the circumstances of the instant case, the trial court was authorized to apply the rule that prior negotiations of a contract which are subsequently reduced to writing are all merged into the written instrument. Guilford v.Spartan Food Systems, Inc., 372 So.2d 7, 9 (Ala. 1979); Long v.Hirs, 270 Ala. 131, 135, 116 So.2d 605, 608 (1959). Moreover, since the amendment to the June 15, 1978, contract obligated sellers to effectuate a subordination agreement at the closing, the trial court was further authorized under the facts to find that sellers' execution of the subordination agreement on November 10, 1978, was neither due to nor in reliance upon any alleged representations made by Eley. Consequently, in the absence of any proof of sellers' reliance upon the alleged representations, the directed verdict entered by the trial court was proper. Perdue v. Mitchell, 373 So.2d 650, 652
(1979).
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.
 ON APPLICATION FOR REHEARING