James E. SANFORD, Plaintiff,

v.

H.A.S., INC., d/b/a Budget Car Sales, et al., Defendants.

No. CIV. A. 98–T–680–N.

United States District Court, M.D. Alabama, Northern Division.

March 6, 2001.

Joseph (Jay) Brady Lewis, Law Offices of Jay Lewis, Terry R. Smyly, Montgomery, AL, for Plaintiff.

Paul M. James, Jr., Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, John Q. Somerville, Galloway & Somerville, LLC, Birmingham, AL, Eric Allison Bowen, Eric A. Bowen, Attorney, Montgomery, AL, Jere F. White, Jr., Lightfoot, Franklin & White, L.L.C., Birmingham, AL, for Defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff James E. Sanford sued defendants H.A.S., Incorporated (d/b/a Budget Car Sales), World Omni Financial Corporation, Jim Moran and Associates, Fidelity Warranty Services Corp., and three of their employees, initially in state court for various claims of fraud arising out of Sanford's purchase of a car from H.A.S. in 1996. In an amended complaint, Sanford added a claim under the federal Truth–in–Lending Act, 15 U.S.C.A. §§ 1601–1677. Defendants then properly removed the case from state to federal court pursuant to 28 U.S.C.A. § 1446(b). Jurisdiction here is proper under 15 U.S.C.A. § 1640(e) and 28 U.S.C.A. §§ 1331 (federal question) and 1367 (supplemental).

This lawsuit is currently before the court on defendants' multiple motions to dismiss and for summary judgment or, in the alternative, to compel arbitration and stay proceedings pending arbitration. For the reasons that follow, all pending motions will be denied.

## I. BACKGROUND

This case has evolved markedly as it has traveled its long, procedural path. Originally filed as a straightforward claim of fraud, Sanford now seeks to represent a class of individuals who purchased used cars from H.A.S. and obtained financing from World Omni and its co-defendants and who, according to Sanford, now have claims for violations of the Truth–in–Lending Act. Along the way, Sanford's factual allegations have also changed. For example, at one point Sanford claimed that the signature on the arbitration agreement that is the subject of the present motions was a forgery. Sanford now admits to the signature and no longer makes that claim.

Currently, Sanford alleges the following facts. On May 4, 1996, Sanford and his wife arrived at Budget Car Sales in Montgomery, Alabama, intending to purchase a car. They were assisted that day by Budget salesman Ron Kennedy, who showed them a used 1995 Hyundai Scoupe. When Sanford expressed interest in buying the

car, Kennedy filled out a credit application for him. Sanford agreed to make a $ 500 downpayment, which Kennedy said Budget would match. Kennedy informed Sanford that his monthly payment would be $ 278.

Sanford then met with Ron Winfield, the Budget finance manager. Winfield had Sanford sign several documents including a five-year extended warranty, a worksheet, a credit application, and a retail purchase contract. Sanford also admits to signing an arbitration agreement on May 4 as well.[1] Although the agreement is dated "5-15-96," it is uncontested that Sanford signed, but did not date, the agreement on May 4. The date was subsequently added by a Budget employee when paperwork for a later, May 9, purchase was completed.

Sanford took the car home that night, but with an option to return it within a specified period of time should he find the car to have problems. H.A.S. apparently gives all customers this option. Sanford was, in fact, not satisfied with the car, and he returned it to Budget on May 6, explaining that the car had "too many problems" and that his daughter was concerned that she could not make the monthly pay-

ments.[2] At that time, Sanford was given his $ 500 downpayment back, but he told an H.A.S. representative that if Budget fixed the car, "he might would buy it." [3]

The next day, Sanford called Kennedy to ask if he could still purchase the car and was told that he could purchase it as soon as it was repaired. Sanford went to Budget on May 8 with another $ 500 downpayment, and returned on May 9 to complete the transaction. On May 9, Kennedy told Sanford that the original financing plan was no longer possible, and that he could offer only a financing agreement that would have monthly payments of $ 334.87 and an interest rate of 19 %. When informed of this, Sanford got up to leave. Kennedy spoke with a finance manager—apparently a different finance manager from the one on May 4—and offered to refinance the deal in six months—that is, if Sanford agreed to pay the higher interest for the initial six-month period, H.A.S. would give him a lower interest rate and monthly payment. Sanford agreed to the deal.

On May 9, Kennedy had Sanford sign the following documents: (1) a disclosure

---

**1.** *See* Plaintiff's Ex. 24. The arbitration agreement reads, in relevant part:

"ARBITRATION AGREEMENT: Buyer acknowledges and agrees that the vehicle purchased herein is a used vehicle and traveled extensively. Buyer thus acknowledges that the vehicle and other aspects of the sale or financing transaction are involved in, affect, or have a direct impact upon, interstate commerce. Therefore, buyer and dealer agree that all claims, demands, disputes, or controversies of every kind or nature that may arise between them concerning any of the negotiations leading to the sale or financing of the vehicle, terms and provisions of the sale or financing agreement, arrangements for financing, purchase of insurance, purchase of extended warranties or service contracts, the performance or condition of the vehicle, or any other aspects of the vehicle and its sale or financing shall be settled by binding arbitration con-

ducted according to the Commercial Rules of the American Arbitration Association. Without limiting the generality of the foregoing, it is the intention of the buyer and the dealer to resolve by binding arbitration all disputes between them concerning the vehicle, its sale or financing, and its condition, including disputes concerning the terms and conditions of the sale or financing, the condition of the vehicle, any damage to the vehicle, the terms and meaning of any documents signed or given in connection with the sale or financing, any representations, promises or omissions made in connection with the financing, credit life insurance, disability insurance, and vehicle extended warranty or service contract purchased or obtained in connection with the vehicle."

**2.** *See* Dep. of James Sanford at 32.

**3.** *Id.*

of discount fee; (2) another extended warranty form; (3) an agreement to keep insurance on the car; (4) a second retail purchase contract; and (5) a World Omni Financial Corporation retail installment sale contract. The second retail agreement with Budget listed a different "selling price" ($ 11,636.68 compared to $ 11,992.00), "total cash deal price" ($ 12,386.60 compared to $ 12,752.40) and "unpaid balance" ($ 11,216.60 compared to $ 11,502.40) from the ones in the May 4 contract.[4] No arbitration agreement was discussed or signed on May 9. The record does not reflect that defendants refinanced the deal after six months.

Defendants seek to compel arbitration based on the arbitration agreement signed by Sanford on May 4. Sanford currently opposes these motions for arbitration on three grounds: (1) the arbitration agreement was fraudulently induced and is therefore unenforceable; (2) even if the agreement is enforceable, it does not apply to the May 9 transaction; and (3) even if the arbitration agreement applies to the May 9 transaction, it is unenforceable under 1975 Ala.Code § 5–19–1. The court now turns to these contentions.

## II.  DISCUSSION

■ When a party challenges the validity of an arbitration agreement, the court must first determine whether the challenge goes to the arbitration agreement itself, or to the underlying contract in its entirety. Pursuant to the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16, general contract principles such as fraud, duress, or unconscionability may be employed to invalidate agreements to arbitrate. *See Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 281,

115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) ("[9 U.S.C.A. § 2] gives states a method for protecting consumers against unfair pressure to agree to a contract with an unwanted arbitration provision. States may regulate contracts, including arbitration clauses, under general contract principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.' ").

■ But the court may resolve these issues only if they are directed to the arbitration clause itself. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967) ("a federal court may consider only issues relating to the making and performance of the agreement to arbitrate"). If the plaintiff challenges the validity of the contract itself, that challenge is an issue for arbitration only. *Id.* ("the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally").

Each of the grounds advanced by Sanford in opposition to the pending motions addresses the arbitration agreement or clause. Sanford's present fraudulent inducement claim alleges facts addressing representations concerning only the arbitration agreement itself; the court does not understand Sanford's argument here as attacking the validity of the contract as a whole. Similarly, Sanford's argument that the May 4 arbitration agreement does not apply to the May 9 contract requires the court to construct the terms of the agreement in light of the contracts signed on May 4 and 9; the claim is about only the arbitration agreement. Sanford's final argument, which alleges that under 1975

4.  *See* Plaintiff's Ex. 17. The second contract is dated May 4, 1996, because Budget's computer system automatically maintained the original sale date on the subsequent agreement. *See* Dep. of Ronald Winfield at 8–9. The parties do not contest that this second agreement was drawn up and signed on May 9.

Ala.Code § 5–19–6 the arbitration agreement is invalid because a copy was not given to him, is, again, limited to the arbitration agreement. Accordingly, these issues are properly before this court.

### A. Fraudulent Inducement

■ Sanford contends that he was fraudulently induced by Budget sales and finance personnel to sign the arbitration agreement and that it is therefore unenforceable. The arbitration agreement is written on the same form as a "disclaimer of damage" on which the purchaser affirms that he understands he is being sold a used car. A purchaser is required, as was Sanford, to sign the form in two places, once below the disclaimer and again below the arbitration agreement. According to Sanford, customers are intentionally misled into believing that the arbitration agreement applies to the disclaimer only and not, as it states, to "all claims, demands, disputes, or controversies of every kind or nature that may arise."

As evidence of the alleged fraud, Sanford offers videotape recordings of a series of closings around the date of his closing on May 4. Three of the closings were conducted by Rick Boyett, whom Sanford contends fraudulently induced him to sign the arbitration agreement.[5] Sanford characterizes the tapes as evidence of a deliberate policy by H.A.S. to train its staff to mislead customers into misunderstanding the scope of the arbitration agreement. He observes that the clauses are close together, and he contends that the tapes show that H.A.S. employees consistently describe the arbitration agreement in terms which could be construed as limiting its application to disputes arising out of the disclaimer only.

Before reaching the merits of this fraud claim, the court must first address what fraud standard governs. Under Alabama law, "[m]isrepresentations of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." 1975 Ala. Code § 6–5–101; *see also Harris v. M & S Toyota, Inc.*, 575 So.2d 74, 76 (Ala.1991). In *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 421 (Ala.1997), the Alabama Supreme Court held that a party must "reasonably rely" on the misrepresentation for fraud to exist. The court further held that this new rule was prospective only, applying only to cases filed *after* March 17, 1997. *See id.* Sanford filed his complaint in state court on March 17, 1997 (at 4:51 p.m., to be precise). That first complaint included a claim of fraudulent inducement. Accordingly, Sanford's fraud claim proceeds under the law as it existed before the *Parham* decision.

Prior to *Parham*, a plaintiff claiming fraud needed to establish "justifiable reliance" on a representation made by a defendant.

> "[R]eliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representations if that representation is 'one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.' "

*Hickox v. Stover*, 551 So.2d 259, 263 (Ala. 1989) (*quoting Southern States Ford, Inc. v. Proctor*, 541 So.2d 1081, 1091–92 (Ala.

---

**5.** No videotape of Sanford's May 4 closing was submitted into evidence; the May 9 closing, which does not include a discussion of arbitration, has been submitted, but does not address what was or was not represented to Sanford on May 4.

1989)). Even so, "as a matter of law, a person with the ability to read and to understand the nature of the transaction cannot act on an oral representation when that representation is followed by an executed document that contradicts it." *Alfa Mut. Ins. Co. v. Northington,* 561 So.2d 1041, 1046 (Ala.1990).

Sanford's fraud claim fails on two grounds. First, Sanford has failed to identify a misrepresentation of material fact. The gravamen of Sanford's claim is guilt by association. The only evidence he has proffered to establish fraudulent inducement in his case are the representations made to other Budget customers during their closings. Of course, a claim of fraud requires some allegation of a misrepresentation on which Sanford could have relied. *See Rollins v. Foster,* 991 F.Supp. 1426, 1434 (M.D.Ala.1998). There is no evidence in the record as to any statement, no less an alleged misrepresentation, to Sanford on May 4 about the arbitration agreement. Sanford did testify at his deposition that he relied upon representations made by the Budget salesman when he was signing documents on May 4, but he did not recall any particular statement made during the closing relevant to the arbitration agreement or, in fact, whether the agreement was discussed at all.[6] By failing to identify a misrepresentation, Sanford's fraud claim must fail because, simply put, he has not satisfied each of its elements.

Even if the court were to assume that some misrepresentation of material fact were made to Sanford on May 4, inducing him to sign the arbitration agreement, his claim is still insufficient because the substance of the alleged misrepresentation is directly contradicted by the terms of the contract.[7] The justifiable reliance standard did not eviscerate a consumer's duty to read the terms of a document he signs. *See Northington,* 561 So.2d at 1046. The terms of the agreement are unambiguous: it applies to "all disputes" concerning the car. Any representation that "all disputes" meant something less than "all disputes" would have contradicted this plain language. Because there is no evidence that such a contradiction, if it existed, could not have been discovered by Sanford during the closing—say, because Sanford was unable to understand or was prevented from reading the arbitration agreement—he is unable to meet the reliance requirement for fraud under the law.

### B. Application of the Arbitration Agreement to the May 9 Contract

■ Even though it is uncontested that the arbitration agreement was signed by Sanford on May 4, defendants argue that it applies to the transaction on May 9 as well. By agreement of the parties, it is no longer in dispute that two separate transactions occurred on May 4 and May 9.[8] Nonetheless, the defendants continue to argue that the May 4 arbitration agreement governs the May 9 contract because the May 4 agreement purports to apply to "all disputes between [the parties] concerning the vehicle." Because Sanford eventually purchased the same vehicle that was the subject of the May 4 agreement, argue the defendants, the arbitration agreement remains in effect even if the other terms of the contract do not.

■ This argument has no merit. Of course, an arbitration agreement executed at the same time as other agreements concerning the same subject matter is rightly considered an enforceable element

---

**6.** *See* Aff. of James Sanford.

**7.** The court makes no finding as to whether other aspects of Sanford's transactions with the defendants were fraudulent under this standard.

**8.** *See* Order filed November 17, 1998.

of the contract. Under Alabama law, "two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract." *Crown Pontiac, Inc. v. McCarrell*, 695 So.2d 615, 618 (Ala. 1997) (citations omitted). The *McCarrell* court adopted the reasoning of the Fifth Circuit in *Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34 (5th Cir.1990), which held that an arbitration agreement in a license contract could apply to disputes under a purchase contract signed contemporaneously and regarding the same business transaction. It cannot be disputed, therefore, that the arbitration agreement would have been valid had the contract in question been the one signed on May 4.

In *McCarrell*, though, the court concluded that a signed arbitration clause from a prior incomplete sale did not apply to a second retail sales contract in which McCarrell had not signed the arbitration agreement. Defendants here make the same argument that failed in *McCarrell*: where two complete and independent transactions concerning the same vehicle have occurred, one with a valid arbitration agreement and the other without, the terms of the valid arbitration agreement should be given continued effect, while the remainder of the terms from the earlier transaction should not.

■ Admittedly, the *McCarrell* decision rested on the existence of a merger clause in the second contract, which barred the enforcement of previous agreements between the parties, *see* 695 So.2d at 618, and here there does not appear to be a merger clause in any of the documents signed on May 9 by Sanford.[9] Neverthe-

less, defendants' argument must still fail because it amounts to establishing an exception to the parol evidence rule for arbitration agreements. The parol evidence rule provides "that when the parties reduce a contract to writing intended to be a complete contract regarding the subject covered by the contract, no extrinsic evidence of prior or contemporaneous agreements will be admissible to change, alter or contradict such writing." *Bussey v. John Deere Company*, 531 So.2d 860, 862 (Ala.1988). In other words, if the parties considered the May 9 agreement to be a complete understanding between them for the purpose of purchasing the car, then nothing signed by the parties on May 4 can have effect.

It is undisputed that two sales actually occurred: one on May 4 that was repudiated on May 6, and a second one on May 9. By focusing on the phrase "all disputes . . . concerning the vehicle" in the arbitration agreement, the defendants seek to obscure their attempt to import the terms of the prior agreement into the latter. From the plain language of the arbitration agreement, it is clear that only one "sale" was anticipated, that which the parties negotiated contemporaneous to the arbitration agreement on May 4. The arbitration agreement repeatedly references "the sale" or "its sale," not "any sale."

Admittedly, this analysis has an air of linguistic hair-splitting, but that only demonstrates the tenuousness of defendants' argument itself. Neither the parties nor the arbitration agreement considered a situation where the parties would, in essence, buy and sell the car twice, no less twice within the course of a week. What was

---

9. The court notes, however, that copies of both the May 4 and May 9 retail purchase agreements refer to "all the terms and conditions on both back and reverse side hereof." Plaintiff's Exs. 16 & 17. Neither copy, as submitted to the court, has a back or reverse side, so there may be other terms and conditions to which Sanford agreed, but of which the court is unaware.

contemplated on May 4 was the May 4 sale. Under the parol evidence rule, a subsequent agreement discharges the prior one, regardless of when the subsequent agreement was made. *See* 3 Corbin on Contracts § 574 (1960). The five documents signed on May 9—none of which included an arbitration agreement or referenced the May 4 arbitration agreement—became the fully integrated understanding between the parties when they were signed.[10]

This conclusion is supported by the same facts that establish that two separate transactions occurred between the parties. The actions of both Sanford and H.A.S. demonstrate that Sanford's return of the car on May 6 concluded the May 4 transaction and that the parties were starting from scratch on May 9. Sanford testified at his deposition that he had until Monday, May 6, to return the car.[11] H.A.S. apparently accepted Sanford's return of the car without question and without further obligation. There is no evidence that Sanford was under an obligation to purchase the car after he returned it. In addition, it is uncontested that the terms of the May 9 deal were, for whatever reason, materially different from the terms offered Sanford on May 4. The May 9 agreement listed a different bottom-line price for the car, lacked an arbitration agreement, and arranged financing through World Omni at a higher interest rate, among other differences. By making modifications to the terms it offered Sanford, H.A.S. acted as if it were negotiating a new contract with Sanford. Defendants cannot subsequently pick and choose which terms of the old set of agreements they now want to enforce, just as Sanford could not, for example, choose to be bound by the more favorable finance terms of the first contract.

■ The same result is warranted even if, for the sake of argument, the court were to find the arbitration agreement ambiguous on this point. It is a fundamental tenet of contract law that ambiguous terms in a contract are construed against the drafter. *See Strickland v. General Motors Acceptance Corporation,* 578 So.2d 1275, 1277 (Ala.1991). Doing so here requires the court to limit the application of the arbitration agreement to the May 4 contract only.

Because the parties now agree that two transactions took place, the only way defendants' argument makes sense is if the parties entered into an arbitration agreement on May 4 to cover the dealings between the parties. The evidence and the language of the agreement itself support the conclusion that the May 4 arbitration agreement was not freestanding, but an element of the May 4 contract. "[T]wo or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract." *Haddox v. First Alabama Bank of Montgomery,* 449 So.2d 1226, 1228 (Ala.1984). Accordingly, no arbitration agreement governs disputes under the May 9 contract, and no party has grounds to compel Sanford to arbitrate.

---

**10.** Adopting defendants' result would introduce disturbing uncertainty into contract law. For example, defendants could argue that the May 4 agreement compelled arbitration even if Sanford sold the car back to Budget in, say, six months, then repurchased it, say, a year later, under entirely different terms. This is, of course, an unlikely series of transactions, but it should underscore the absurdity of the defendants' expansive construction of the arbitration agreement. Whether the subsequent transactions take place five days or a year apart, a purchaser cannot be bound by prior contract terms unless they are in some manner adopted in the later agreement.

**11.** *See* Dep. of James Sanford at 32–33.

### C. 1975 Ala.Code § 5–19–6

██ Although Sanford has adequately established that the May 4 arbitration agreement does not apply to the contract at issue here, the court turns to his final argument for the sake of completeness and finds that it does not provide alternate grounds for relief. Sanford relies on 1975 Alabama Code § 5–19–6, in Alabama's so-called "Mini–Code," to argue that the arbitration agreement is not valid because he did not receive a copy. Section 5–19–6(a) requires that a "creditor, when extending credit with respect to a consumer credit transaction[,] ... shall at that time furnish to the debtor a copy of each instrument executed by the debtor in connection with the consumer credit transaction." The parties agree that Sanford was not given a copy of the arbitration agreement on May 9.[12] Sanford concludes, therefore, that the only remedy under the law is to declare the arbitration agreement null and void. *See* 1975 Ala.Code § 5–19–16.

This conclusion is incorrect because § 5–19–6 requires a creditor to give the debtor only copies of "each instrument" in the transaction; the arbitration agreement is not such an instrument. The Mini–Code is a supplement to the Uniform Commercial Code, and the definitions of the Uniform Commercial Code, as adopted by Alabama, govern its construction. *See Jefferson v. Mitchell Select Furniture, Co.*, 56 Ala.App. 259, 321 So.2d 216 (1975). The term "instrument" is defined in 1975 Ala.Code § 7–3–104(a)(1) as an "unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." Because the arbitration agreement is not an instrument so-defined, Sanford has no remedy under these provisions of Alabama law.

**12.** *See* Order filed November 17, 1998.

### III. CONCLUSION

Because no arbitration agreement was in effect when defendants sold and financed Sanford's car, the pending motions must be denied. An appropriate order will be entered.

### ORDER

In accordance with the memorandum opinion entered today, it is ORDERED that the following pending motions are denied:

(1) Amended motion to dismiss and for summary judgment or, alternatively, to compel arbitration and for stay pending arbitration, filed by defendants World Omni Financial Corp., et al., on August 21, 1998, in federal court.

(2) Motion to dismiss and for summary judgment or, alternatively, to compel arbitration filed by defendants World Omni Financial Corp., et al., on April 29, 1998, in state court.

(3) Motion to dismiss original complaint, for summary judgment, and to compel arbitration and stay proceedings, filed by defendant H.A.S., Inc. on May 20, 1997, in state court.

(4) Motion to dismiss second amendment to complaint and for summary judgment, filed by H.A.S. Inc. on May 20, 1998, in state court.

(5) Amended motion to dismiss and for summary judgment or, alternatively, motion to compel arbitration, filed by defendants World Omni Financial Corp., et al., on June 30, 1997, in state court.

It is further ORDERED that the request for oral argument filed by plaintiff on October 16, 1998, is denied.

The clerk of the court is DIRECTED to provide a copy of the this order and the

accompanying memorandum opinion to counsel for all parties by facsimile transmittal.