**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DAVID MOONEYHAM; KRYSTINA
MOONEYHAM,

     Plaintiffs - Appellees,

v.

BRSI, LLC, d/b/a Big Red Kia; EXETER
FINANCE CORP,

     Defendants - Appellants.

No. 15-6221
(D.C. No. 5:15-CV-00212-M)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

Plaintiff David Mooneyham purchased a used Dodge Ram from defendant Big
Red Kia (Big Red). Defendant Exeter Finance (Exeter) provided the financing. Two
years later, plaintiffs[1] brought suit against defendants for claims relating to the Ram.
Citing an arbitration agreement that Mooneyham and Big Red executed, defendants
moved to compel arbitration. Plaintiffs objected, arguing that the arbitration
agreement doesn't apply to their claims. The district court agreed and denied

---

[*] This order and judgment isn't binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[1] Plaintiff Krystina Mooneyham appears to be only a nominal plaintiff.

defendants' motion. Because we conclude the arbitration agreement applies to plaintiffs' claims, we reverse.

## BACKGROUND

Mooneyham visited Big Red on February 9, 2013, to purchase a new vehicle. He planned to apply the trade-in value of his old car and a $500 down payment toward the purchase price and to finance any remaining balance due. But based on Mooneyham's credit history, Big Red declined to facilitate financing for a new vehicle. So Mooneyham decided instead to purchase a used 2006 Dodge Ram from Big Red, along with an extended service plan and guaranteed asset protection (GAP) coverage. The total purchase price was $20,739.50, itemized as follows:

- Vehicle Purchase Price: $17,980.00
- Extended Service Plan: $2,500.00
- GAP Coverage: $500.00
- Fees: $259.50
- Down Payment: ($500.00)

Mooneyham received no credit toward the purchase for trading in his old car. Thus, he required financing for the total purchase price of $20,739.50. Mooneyham and Big Red memorialized these terms in two documents executed on February 9: (1) a Retail Purchase Agreement/Bill of Sale (RPA); and (2) a Retail Installment Sale Contract (RISC). Although the documents contain largely overlapping terms, only the RISC sets forth the deal's financing terms.

The RISC states that Big Red is the creditor, but further provides that Big Red "assigns its interest in this contract to EXETER FINANCE CORP[.] (Assignee) under the terms of [Big Red's] agreement(s) with Assignee." App. 74. But Exeter

wasn't a party to the RISC. And nothing in the RISC suggests that the sale was contingent upon Exeter's agreeing to the RISC's terms.

Unlike the RISC, the RPA does contain a financing contingency:

**10. Motor Vehicle Delivery Agreement:** If Vehicle is delivered to Buyer before this sale is complete, subject to obtaining satisfactory financing arrangements, then a "Motor Vehicle Delivery Agreement" shall become a part of this Agreement.

*Id.* at 73. And Big Red and Mooneyham executed just such an agreement—titled a "Motor Vehicle 'Spot Delivery' Agreement"—"as a prelude to an exchange of ownership of the vehicle(s) described herein; subject to Dealer finding a lending institution willing to purchase the Retail Installment Contract executed by the parties." *Id.* at 266.

Mooneyham and Big Red also entered into an "Agreement to Arbitrate" that stated they would "settle by binding arbitration any dispute between them regarding: (1) the purchase by [Mooneyham] of [the Ram]; (2) any products and services purchased in conjunction with [the Ram]; (3) any financing obtained in connection with the transaction; and/or (4) any other dispute related to the purchase/lease transaction." *Id.* at 267.

Finally, Mooneyham and Big Red executed a GAP Addendum, an Extended Service Agreement, and a Vin Etch Protection Warranty. Defendants assert that the parties also executed an Odometer Disclosure Statement and an As-Is Acknowledgment. Plaintiffs don't dispute this assertion.

As provided for in the February 9 Spot Delivery Agreement, Mooneyham

3

drove away in the Ram the same day these documents were executed. But Exeter rejected the proposed financing terms and declined to purchase Big Red's interest in the RISC. On Monday, February 11, Big Red called Mooneyham to inform him that the financing arrangement had "fallen through" and that he needed to sign additional paperwork. *Id.* at 155.

Mooneyham returned to the dealership, and Big Red presented him with Exeter's proposed financing arrangement. Exeter agreed to loan Mooneyham only $19,740 for the purchase, rather than $20,739.50. And although the financed amount decreased by $1,000, the monthly payments increased from approximately $500 to $516. Mooneyham and Big Red signed a second RISC containing these terms.

Because Exeter agreed to finance $999.50 less than originally contemplated, Mooneyham and Big Red also executed a new extended service plan priced at $1,500.50 (exactly $999.50 less than the initial plan). The initial plan covered the Ram for 72 months/85,000 miles; the substitute plan lasted for only 36 months/36,000 miles. The vehicle purchase price, GAP coverage, and fees remained unchanged. Mooneyham and Big Red executed a new Retail Purchase Agreement setting forth these terms. In addition to executing a new RPA, RISC, and extended service plan, Mooneyham and Big Red re-executed several documents they previously executed on February 9: an Agreement to Furnish Insurance Policy, a GAP Addendum, and a Spot Delivery Agreement. They didn't re-execute any of the other original documents, including, critically, the arbitration agreement.

Two years later, on February 9, 2015, plaintiffs filed suit against defendants.

4

They alleged Big Red and Exeter violated various federal lending and consumer protection laws during the purchase and that Big Red failed to disclose that the Ram allegedly had certain defects. Defendants removed the action to federal court and moved to compel arbitration of all claims, relying on the February 9, 2013 arbitration agreement. Plaintiffs objected, arguing that (1) the arbitration agreement was rescinded by the February 11 agreements and wasn't incorporated into the new agreements; (2) Mooneyham didn't assent to the arbitration agreement; and (3) the arbitration agreement is unconscionable.

The district court agreed with plaintiffs that the arbitration agreement doesn't cover their claims. Specifically, the district court concluded that the parties entered into two separate transactions and that while the arbitration agreement covered only the first transaction, plaintiffs' claims arise only from the second transaction. Accordingly, it denied defendant's motion to compel arbitration without addressing plaintiffs' alternative arguments. Defendants appeal.

## DISCUSSION

### I. The arbitration agreement applies to plaintiffs' claims.

We generally review de novo the denial of a motion to compel arbitration. *Nesbitt v. FCNH, Inc.*, 811 F.3d 371, 376 (10th Cir. 2016). But plaintiffs assert that we should instead review the district court's denial of defendants' motion for clear error. *See Naimie v. Cytozyme Labs.*, 174 F.3d 1104, 1111 (10th Cir. 1999) (explaining that we review primarily factual questions for clear error).

5

Plaintiffs' argument rests on the premise that a contract (presumably, the arbitration agreement) can't be formed without a meeting of the minds—the existence of which presents a question of fact under Oklahoma law. *See O'Neal v. Harper*, 75 P.2d 879, 882 (Okla. 1937); *Gentry v. Fife*, 155 P. 246, 247 (Okla. 1916).[2] But there's no question that the parties here formed a contract. Indeed, plaintiffs concede Mooneyham and Big Red entered into the arbitration agreement; they simply dispute its applicability to their claims. *See* Aplee. Br. 13 ("The [arbitration agreement] cited and relied upon by [defendants] only applies to the transaction that was not rescinded . . . ."). Thus, the district court's conclusion that the arbitration agreement doesn't apply to plaintiffs' claims turns on the *scope* of that agreement, not its existence. And the scope of the agreement presents a legal question that we review de novo. *Nesbitt*, 811 F.3d at 376.

We begin with the language of the arbitration agreement. *See* Okla. Stat. tit. 15, § 155 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ."). On February 9, 2013, Mooneyham and Big Red agreed "to settle by binding arbitration any dispute between them regarding: (1) the purchase by [Mooneyham] of [the Ram]; (2) any products and services purchased in conjunction with [the Ram]; (3) any financing

---

[2] Oklahoma law governs this appeal. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

obtained in connection with the transaction; and/or (4) any other dispute related to the purchase/lease transaction." App. 42.

On its face, this comprehensive provision appears to cover each of plaintiffs' claims; those claims all relate to "the purchase by [Mooneyham] of [the Ram]." *Id.* And several claims also relate to the "financing obtained in connection with the transaction." *Id.* But the district court concluded that the agreement doesn't apply to plaintiffs' claims. It reasoned that (1) the parties entered into two separate transactions—one on February 9, 2013, and another on February 11, 2013; (2) plaintiffs' claims relate solely to the second transaction; and (3) the arbitration agreement doesn't apply to the second transaction.

The key premise underlying the district court's conclusion is that the parties entered into two separate transactions for the purchase of the Ram. We disagree. The parties' conduct, and they documents they executed, evince a single transaction occurring over two days.

To begin, we agree with defendants that the parties didn't finalize the purchase on February 9. Instead, the purchase was contingent upon Exeter's approval of the financing terms. This strongly suggests the parties began the transaction—but didn't conclude it—on February 9.

The February 9 Spot Delivery Agreement and RPA, working in conjunction, create this contingency. The RPA states, "If Vehicle is delivered to Buyer before this sale is complete, subject to obtaining satisfactory financing arrangements, then a 'Motor Vehicle Delivery Agreement' shall become a part of this Agreement." *Id.* at

7

261. The RPA thus expressly contemplates and incorporates the February 9 Spot Delivery Agreement.

Mooneyham and Big Red executed that agreement "as a prelude to an exchange of ownership of the [Ram]; subject to Dealer finding a lending institution willing to purchase the Retail Installment Contract executed by the parties." *Id.* at 266. And it required Mooneyham to "return [the] vehicle within 24 hours of any verbal or written notice that the deal [could not] be completed." *Id.* Finally, the February 9 Spot Delivery Agreement contains Mooneyham's signed acknowledgement that the Spot Delivery Agreement was necessary because, as of the date he signed it, his "loan ha[d] not been approved." *Id.* These provisions all indicate that the purchase wasn't final on February 9.

Nevertheless, plaintiffs contend that the February 9 agreements weren't contingent. They assert that this is evident from the parties' decision to execute a second Spot Delivery Agreement on February 11. Because Exeter proposed the modified financing terms, plaintiffs argue, there was no need to make the February 11 agreement contingent on Exeter's acceptance of those terms. But regardless of whether the February 11 Spot Delivery Agreement was strictly necessary, Mooneyham and Big Red apparently chose not to assume that Exeter would agree to the financing terms merely because it proposed them. That cautious approach didn't retroactively undo the contingent nature of the February 9 agreements.

Plaintiffs also argue that the February 9 agreements weren't contingent because the RISC (the financing agreement) doesn't contain a contingency provision.

8

It's true that the RISC, standing alone, doesn't create a contingency. And the RISC does state, "This contract contains the entire agreement between you and us relating to this contract." *Id*. at 74. But we agree with defendants that this provision (which plaintiffs call a merger clause) applies only to the RISC itself—that is, the clause precludes incorporation of other agreements into the RISC. But the clause doesn't preclude incorporation of other agreements into the transaction as a whole.[3]

Moreover, under Oklahoma law, the RISC can't be read in a vacuum. "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Okla. Stat. tit. 15, § 158. *See also Strickland v. Am. Bakery & Confectionery Workers Union & Indus. Nat'l Welfare Fund*, 527 P.2d 10, 13 (Okla. 1974) ("[W]here two written instruments refer to the same subject matter and on their face show that each was executed as a means of carrying out the intent of the other, both should be construed as one contract."). By its terms, the February 9 Spot Delivery Agreement plainly operates alongside the

---

[3] For the same reason, we reject plaintiffs' argument that this merger clause and a similar clause in the RPA preclude incorporation of the arbitration agreement into the overall transaction. And to the extent the extra-jurisdictional cases that plaintiffs cite relied on merger clauses in refusing to enforce arbitration agreements, we therefore decline to follow them. *See Crown Pontiac, Inc. v. McCarrell*, 695 So. 2d 615, 618 (Ala. 1997) (giving force to a merger clause in a later-executed version of *same* document); *Duval Motors Co. v. Rogers*, 73 So. 3d 261, 264, 267-68 (Fla. Dist. Ct. App. 2011) (refusing to apply principle that documents executed contemporaneously should be read together). Plaintiffs also cite *Krueger v. Heartland Chevrolet, Inc.*, 289 S.W.3d 637, 639-40 (Mo. Ct. App. 2009), which the Missouri Supreme Court later overruled using the same reasoning we apply here. *See Johnson ex rel. Johnson v. JF Enters.*, 400 S.W.3d 763, 769 (Mo. 2013). Finally, plaintiffs cite *Rugumbwa v. Betten Motor Sales*, 136 F. Supp. 2d 729, 733 (W.D. Mich. 2001), which relied on a Michigan law not applicable here.

RISC. It states that it is "incorporated by reference into all documents relating to the purchase of [the Ram], including the Retail Purchase Agreement and the *Retail Installment Contract*." App. 266 (emphasis added).

Although the RISC doesn't reciprocate this reference, that omission doesn't override the intent that Mooneyham and Big Red clearly expressed by executing the agreements together. *See Glover v. Cornish* (*In re Estate of Carlson*), 367 P.3d 486, 491 n.1 (Okla. 2016) (holding that § 158's rule of construction applies "although the instruments do not in terms refer to each other" (emphasis omitted) (quoting *Pauly v. Pauly*, 176 P.2d 491, 495 (Okla. 1946))). Moreover, the RPA—a key document in the purchase—does expressly reference and incorporate the February 9 Spot Delivery Agreement.

Finally, as a practical matter, ignoring the conditional language and effect of the February 9 Spot Delivery Agreement would render its execution pointless. Its sole purpose was to let Mooneyham drive away in the Ram, despite the fact that Exeter hadn't yet approved the financing terms. If the February 9 purchase wasn't contingent on Exeter's approval, then the parties signed the February 9 Spot Delivery Agreement for no reason—an interpretive result that we must avoid. *McGinnity v. Kirk*, 362 P.3d 186, 199 (Okla. 2015) ("A contract is to be construed as a whole, giving effect to each of its parts, and not construed so as to make a provision meaningless, superfluous or of no effect." (footnote omitted)).

10

Accordingly, we conclude that the contingent nature of the February 9 purchase suggests the parties continued the same transaction into February 11, rather than starting a new one on that date.

That conclusion is bolstered by the fact that, as defendants note, the vehicle's ownership changed hands only once. Although the February 9 Spot Delivery Agreement was "executed as a prelude to an exchange of ownership," App. 266, Mooneyham purchased insurance for the Ram on February 11 in his capacity as its owner. And on February 9, Mooneyham and Big Red executed an Odometer Disclosure Statement, which was required to reflect the Ram's mileage "at the time of transfer of [the] vehicle." Okla. Stat. tit. 47, § 1107.1.

Nothing in the record indicates the parties transferred ownership back to Big Red on February 11 and then re-transferred it to Mooneyham. They didn't execute a new Odometer Disclosure Statement showing the mileage the Ram accrued between February 9 and 11. Big Red didn't demand return of the Ram—an option the February 9 Spot Delivery Agreement contemplates if "the deal cannot be completed." App. 266. And Mooneyham didn't demand return of his trade-in vehicle.[4]

_____

[4] Our conclusion that the vehicle's ownership changed hands only once—on February 9—seems supported by Okla. Stat. tit. 47, § 1-141. Under that statute, ownership is deemed to pass upon possession, despite the conditionality of sale: "[I]n the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with a right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, . . . then such conditional vendee or lessee . . . shall be deemed the owner for the purpose of this Code." § 1-141. Of course, neither party cites this statute, and it isn't essential to our decision.

11

In concluding that the parties entered into two separate transactions, the district court focused solely on the fact that they modified several terms after their initial agreement on February 9. The district court identified these as (1) different financing terms; (2) "[a] new and different Retail Purchase Agreement/Bill of Sale[,] . . . which included a different total selling price;"[5] and (3) a different extended service plan. *Id.* at 156-57.

True, certain terms in the parties' final agreement differ from those in their initial agreement. But neither the district court nor plaintiffs bridge the gap between that premise and their conclusion—that the parties entered into two transactions. Instead, for the reasons discussed above, we conclude that the parties engaged in only a single transaction. And that conclusion renders *Sanford v. H.A.S., Inc.*, 136 F. Supp. 2d 1215, 1222 (M.D. Ala. 2001), which the district court relied on in concluding that the arbitration agreement didn't apply, inapposite.

In *Sanford*, plaintiff purchased a car from a dealership and signed an arbitration agreement. The dealership gave plaintiff the right to return the car "should he find the car to have problems." *Id.* at 1218. The deal was final, but plaintiff could revoke it at *his* option. And he did so two days later, when he claimed the car had "too many problems" and returned it in exchange for return of his down payment. *Id.* Two days after that, plaintiff returned to the dealership with another down payment

---

[5] While the two RPAs list a different "balance due on delivery" (because that amount includes the price of the extended service plan), they list the same "total selling price" because the cash price of the vehicle and the GAP coverage price didn't change. App. 72, 260.

12

when the dealership told him the problems could be repaired. The next day, the parties negotiated a new deal, and plaintiff re-purchased the car—this time without signing an arbitration agreement. *Id.* at 1218-19. The court declined to compel arbitration, *id.* at 1224, finding that plaintiff bought the car, returned it, and bought it again, *id.* at 1222 ("It is undisputed that two sales actually occurred . . . ."). Those two purchases amounted to two transactions. Here, by contrast, plaintiffs purchased the car only once. Thus, the district court's reliance on *Sanford* was misplaced.

Plaintiffs also cite an array of mostly extra-jurisdictional cases in which each court declined to compel arbitration after the parties entered into an initial agreement containing an arbitration clause but then executed a subsequent agreement lacking one.[6] But these cases are inapt for the same reason as *Sanford*: unlike the parties in the cases plaintiffs cite, Big Red and Mooneyham conducted a single transaction (albeit over multiple days).

Finally, plaintiffs argue that the Oklahoma Supreme Court's recent decision in *Walker v. BuildDirect.com Technologies, Inc.*, 349 P.3d 549 (Okla. 2015), is controlling. There, a consumer contract stated that it was subject to the seller's "Terms of Sale." *Walker*, 349 P.3d at 551. The contract contained no such terms, but

---

[6] *See Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1113 (11th Cir. 2014); *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 523, 526 (2d Cir. 2011); *Smith v. Steinkamp*, 318 F.3d 775, 777-78 (7th Cir. 2003); *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 870, 875 (7th Cir. 1985); *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696, 700, 713 (D. Md. 2008); *Harris v. David Stanley Chevrolet, Inc.*, 273 P.3d 877, 879 (Okla. 2012); *Davis v. KB Home of S.C., Inc.*, 713 S.E.2d 799, 805-06 (S.C. Ct. App. 2011), *aff'd in pertinent part, vacated in part*, No. 2011-199587, 2014 WL 2535489 (S.C. Jan. 29, 2014).

13

the seller asserted that the phrase referred to a document bearing that title on its website. Citing an arbitration clause contained in the online document, the seller sought to compel arbitration. *Id.* at 552. The Oklahoma Supreme Court held that the contract didn't incorporate the arbitration clause in the online document, *id.* at 554, in large part because the purchasers didn't "ha[ve] reasonable notice of and assent[] to the terms to be incorporated," *id.* at 553. But unlike the plaintiffs in *Walker,* Mooneyham plainly had notice of the arbitration agreement; after all, he signed it. Accordingly, *Walker* is inapplicable here.

Because we disagree with the district court's conclusion that the parties conducted two separate transactions, we conclude that the arbitration agreement applies to the parties' disputes. But even if we agreed the parties entered into two transactions, the arbitration agreement's plain language would still apply to plaintiffs' claims. By its terms, the agreement applies to disputes over "*any* financing obtained in connection with the transaction" and "*any* other dispute related to the purchase/lease transaction." App. 42 (emphases added). Even if the parties entered into two final, non-contingent financing or purchase agreements, this language covers "any" such agreement, *id.*—not only those the parties signed on February 9. Accordingly, we conclude that the arbitration agreement applies to plaintiffs' claims.

## II.    The arbitration agreement isn't unconscionable.

Alternatively, plaintiffs argue that we should affirm the district court's order because the arbitration agreement is unconscionable. Although the district court

14

didn't reach this issue, we conclude as a matter of law that the agreement isn't

unconscionable and therefore decline to affirm on this basis.

Plaintiffs first argue the agreement is unconscionable because it provides,

"[T]he Parties agree they are not waiving their right to exercise any self-help or

provisional remedy available by law or pursuant to an agreement between them."

App. 42. Relying solely on California law, plaintiffs argue this provision renders the

agreement unconscionable because it's one-sided: Big Red could repossess the car

while still seeking arbitration, but plaintiffs have no corresponding self-help remedy.

*See Trompeter v. Ally Fin., Inc,* 914 F. Supp. 2d 1067, 1073-74 (N.D. Cal. 2012)

(characterizing arbitration agreement as unconscionable in part because it allowed

"creditor [to] repossess a vehicle or file suit to collect a debt owed by a defaulting car

buyer," while providing "no corresponding remedy" to debtor).[7] But even if

California law were instructive in Oklahoma, subsequent California Supreme Court

decisions have called *Trompeter* into question. *See Sanchez v. Valencia Holding Co.*

353 P.3d 741, 756 (Cal. 2015) ("[W]e see nothing unconscionable about exempting

the self-help remedy of repossession from arbitration."); *Pinnacle Museum Tower*

*Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012) ("A contract

term is not substantively unconscionable when it merely gives one side a greater

benefit . . . ."). Plaintiffs cite no Oklahoma law supporting their argument, and they

---

[7] Defendants argue that we should decline to consider this specific
unconscionability argument because plaintiffs failed to advance it below. But we're
free to affirm on any basis that finds support in the record, even if plaintiffs didn't
present it to the district court. *See Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1165
(10th Cir. 2004).

15

wholly fail to explain why one-sided self-help remedies render an arbitration agreement inherently unconscionable. Accordingly, we reject this argument.

Plaintiffs next argue that the arbitration agreement is unconscionable because of its cost structure. They assert arbitration costs can range from $10,000 to $50,000, which they maintain is beyond their means. But as defendants note, plaintiffs misunderstand the agreement's cost structure. Plaintiffs' costs are limited to $750 because defendants initiated arbitration. Plaintiffs don't suggest this fixed cost is so exorbitant as to render the arbitration agreement unconscionable, and we conclude that it is not.

### CONCLUSION

Mooneyham bought one truck, and he bought it only once. In doing so, he signed an arbitration agreement covering "any dispute" regarding the purchase of the truck. True, the parties renegotiated several terms before finalizing the purchase. But that fact doesn't nullify the agreement. Nor is the agreement unconscionable. Accordingly, we reverse the district court's order denying defendants' motion, and we remand with directions to stay the proceedings and compel arbitration.

Entered for the Court


Nancy L. Moritz
Circuit Judge

16

15-6221, *Mooneyham v. BRSI, LLC d/b/a Big Red Kia; Exeter Finance Corp.*

**PHILLIPS**, Circuit Judge, dissenting.

I respectfully dissent. The majority concludes that the single Agreement to Arbitrate applies to both the attempted transaction on February 9, 2013 and the completed transaction on February 11, 2013, despite language suggesting otherwise in the Agreement to Arbitrate.

In conspicuous writing immediately above Mooneyham's signature, the Agreement to Arbitrate proclaims that "THIS AGREEMENT IS INCORPORATED BY REFERENCE INTO *THE* RETAIL PURCHASE AGREEMENT." App. 267 (emphasis added). A document incorporated by reference "'becomes constructively a part of the writing,' forming a single instrument." *Walker v. Builddirect.com Technologies Inc.*, 349 P.3d 549, 553 (Okla. 2015) (quoting 11 Williston on Contracts § 30:25 (4th ed. 1999)). When Mooneyham signed the Agreement to Arbitrate on February 9, 2013, *one* Retail Purchase Agreement existed—the Retail Purchase Agreement dated the same day. But that Retail Purchase Agreement failed because Exeter rejected the proposed financing terms. That left *no* Retail Purchase Agreements to incorporate the Agreement to Arbitrate.[1]

On February 11, BRSI notified Mooneyham that financing was disapproved and had him return to the dealership. Upon his returning, BRSI presented Mooneyham with a new Retail Purchase Agreement with less favorable terms. In the new agreement,

_____

[1] BRSI is a sophisticated business with skilled attorneys who easily could have worded this to include future retail purchase agreements to ease our interpretative task.

Mooneyham's monthly payments increased from about $500 to $516, the amount financed declined by $1,000, and the extended service plan shrunk from 72 months/85,000 miles to 36 months/36,000 miles.

BRSI could have avoided this lawsuit by having Mooneyham sign another Agreement to Arbitrate (assuming he would still have signed despite the described less-favorable terms). But BRSI chose not to do so. Instead, BRSI forged ahead with the February 11, 2013 Retail Purchase Agreement, which did not incorporate the arbitration agreement.[2]

I don't know why BRSI did not ask Mooneyham to sign an Agreement to Arbitrate when he signed the second purchase agreement. Perhaps it was careless, perhaps it was overconfident that the earlier Agreement to Arbitrate survived the failed transaction, or perhaps it was concerned that Mooneyham might not be in a mood to sign another arbitration agreement. But to cure its failure, BRSI would have us assume that Mooneyham would have signed a second arbitration agreement and hold him to it. I decline to do so and would affirm the district court's decision.

---

[2] At oral argument, BRSI's counsel agreed that some changes to a purchase agreement could necessitate a second Agreement to Arbitrate, but he disputed that those circumstances existed in this case. Oral Arg. 26:41–28:25.

2